**No. 26-1357**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**
_____

**GREGORY BOYD; JONATHAN LASSERS; GFC HOLDINGS, LLC;
BIOMASS GREEN FUELS, LLC,**
*Plaintiffs-Appellants,*
**v.**
**BANCO POPULAR DE PUERTO RICO,**
*Defendant-Appellee.*

_____

On Appeal from the United States District Court
for the District of Puerto Rico
No. 3:24-cv-01569-PAD
Hon. Pedro A. Delgado-Hernández, U.S. District Judge

BRIEF OF PLAINTIFFS-APPELLANTS
GREGORY BOYD, JONATHAN LASSERS,
GFC HOLDINGS, LLC, AND BIOMASS GREEN FUELS, LLC

Jane A. Becker Whitaker
First Circuit Bar No. 35763
P.O. Box 9023914
San Juan, PR 00902-3914
Tel. (787) 585-3824
jbw@beckervissepo.com

Luis E. Miñana
First Circuit Bar No. 118149
ESPADA, MIÑANA & PEDROSA
LAW OFFICES, P.S.C.
122 Calle Ing. Manuel Domenech,
Altos
San Juan, PR 00918
Tel. (787) 402-2226
minanalaw@yahoo.com

Counsel for Appellants Gregory Boyd and Jonathan Lassers,
individually and derivatively on behalf of
GFC Holdings, LLC and Biomass Green Fuels, LLC

**CORPORATE DISCLOSURE STATEMENT**

Appellants Gregory Boyd and Jonathan Lassers are natural persons. No disclosure statement is required of them under Federal Rule of Appellate Procedure 26.1(a).

GFC Holdings, LLC and Biomass Green Fuels, LLC filed disclosure statements on this Court's docket on July 10, 2026. Those statements report:

GFC Holdings, LLC is a Puerto Rico limited liability company. It has no parent corporation, and no publicly held corporation owns 10% or more of its membership interests.

Biomass Green Fuels, LLC is a Puerto Rico limited liability company. Its sole member is GFC Holdings, LLC. No publicly held corporation owns 10% or more of its membership interests.

This information is reproduced here pursuant to Federal Rules of Appellate Procedure 26.1(d)(2) and 28(a)(1). Its inclusion does not represent that Boyd or Lassers independently has authority to speak for either Company.

**TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ..................................................................................v

INTRODUCTION ................................................................................................1

JURISDICTIONAL STATEMENT ......................................................................3

QUESTIONS PRESENTED..................................................................................4

STATEMENT OF THE CASE..............................................................................5

    A. The judgment rests on a disputed surrender of the Companies' claims...5

    B. The anti-tying allegations and the proposed pleading .............................7

    C. The record never supplied case-specific dismissal authority ..................9

    D. The court adopted another case's ruling without deciding this case-specific question ...............................................................................................10

    E. The proposed amended complaint supplied the missing pleading framework...........................................................................................................11

SUMMARY OF THE ARGUMENT ...................................................................13

ARGUMENT ......................................................................................................15

  I. THE JUDGMENT CANNOT REST ON THE DISPUTED DISMISSAL WITHOUT A FINDING THAT THE COMPANIES AUTHORIZED IT.......15

    A. Atty. Abesada required actual authority to dismiss the Companies' claims, which he could not acquire because of his conflict of interest. ......16

B. The March 21 document did not authorize dismissal with prejudice.....19

C. Neither the rejection of a competing consent nor the order granting the notice of voluntary dismissal established Atty. Abesada's authority. ........24

D. The Court should reverse the dismissal of Boyd and Lassers, vacate the rulings resting on the notice of voluntary dismissal, and remand with instructions...................................................................................................26

II. THE RULE 59 ORDER CANNOT STAND BECAUSE THE PROPOSED COMPLAINT SUPPLIED SPECIFIC CURES AND A VALID BHCA CLAIM....................................................................................................29

A. Boyd and Lassers invoked a recognized Rule 59 ground and followed the required procedure. ..............................................................................29

B. No adequate reason for the denial is apparent from this record. ............32

C. The proposed complaint repaired verification and demand-futility defects. ...................................................................................................36

D. The off-take allegations plausibly stated a BHCA claim. ......................39

E. The proposed complaint materially expanded the bond-and-insurance allegations. ...........................................................................................47

F. No alternative ground supports affirmance...........................................48

III. ARTICLE III, CLAIM OWNERSHIP, STATUTORY CAUSATION, AND DERIVATIVE PROCEDURE ARE DISTINCT INQUIRIES. ..............48

A. Article III injury does not decide who owns the cause of action. ..........48

B. The entity claims proceed through ordinary and double-derivative paths.

.................................................................................................50

C. Boyd's personal theory is an alternative, not a necessary ground..........52

D. Any true Article III dismissal must be without prejudice. .....................53

CONCLUSION.....................................................................................54

CERTIFICATE OF COMPLIANCE.......................................................56

CERTIFICATE OF SERVICE ...............................................................57

ADDENDUM ........................................................................................1

# TABLE OF AUTHORITIES

**CASES**

*ACA Financial Guaranty Corp. v. Advest, Inc.*, 512 F.3d 46 (1st Cir. 2008) .........30

*Acosta-Mestre v. Hilton International of Puerto Rico, Inc.*, 156 F.3d 49 (1st Cir. 1998) ................................................................................................................30

*Amerifirst Properties, Inc. v. FDIC*, 880 F.2d 821 (5th Cir. 1989).........................41

*Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983)..................................................................................................50

*B.C. Recreational Industries v. First National Bank of Boston*, 639 F.2d 828 (1st Cir. 1981) ............................................................................................................44

*Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440 (5th Cir. 1986).......................50

*Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711 (1st Cir. 2014) 30, 31

*City of Jacksonville v. Jacksonville Hospitality Holdings, L.P.*, 82 F.4th 1031 (11th Cir. 2023) ...........................................................................................................23

*Costner v. Blount National Bank*, 578 F.2d 1192 (6th Cir. 1978)...........................50

*Dibidale of Louisiana, Inc. v. American Bank & Trust Co.*, 916 F.2d 300 (5th Cir. 1990) ...................................................................................................................41

*Doraleh Container Terminal SA v. Republic of Djibouti*, 109 F.4th 608 (D.C. Cir. 2024) ...................................................................................................................19

*Executive Leasing Corp. v. Banco Popular de Puerto Rico*, 48 F.3d 66 (1st Cir. 1995) ..................................................................................................46

*Fisher v. Kadant, Inc.*, 589 F.3d 505 (1st Cir. 2009)..............................................31

*Foman v. Davis*, 371 U.S. 178 (1962) ...................................................... 32, 33, 36

*Gabriel v. Preble*, 396 F.3d 10 (1st Cir. 2005)......................................................52

*Gianfrancesco v. Town of Wrentham*, 712 F.3d 634 (1st Cir. 2013)................ 49, 50

*Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996)...........................46

*Gracia-Gracia v. Financial Oversight & Management Board for Puerto Rico*, 939 F.3d 340 (1st Cir. 2019)...................................................................................36

*Hayes v. New England Millwork Distributors, Inc.*, 602 F.2d 15 (1st Cir. 1979). 32, 35

*Hochendoner v. Genzyme Corp.*, 823 F.3d 724 (1st Cir. 2016) ....................... 49, 54

*Koster v. Lumbermens Mutual Casualty Co.*, 330 U.S. 518 (1947).......................51

*Lambrecht v. O'Neal*, 3 A.3d 277 (Del. 2010) ................................................ 39, 51

*Malavé v. Carney Hospital*, 170 F.3d 217 (1st Cir. 1999) ......................... 17, 19, 21

*Maroni v. Pemi-Baker Regional School District*, 346 F.3d 247 (1st Cir. 2003).....47

*Meredith v. The Ionian Trader*, 279 F.2d 471 (2d Cir. 1960) ...............................19

*Michaud v. Michaud*, 932 F.2d 77 (1st Cir. 1991) ...............................................17

*Mid-State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333 (7th Cir. 1989)...................................................................................................53

*Nikitine v. Wilmington Trust Co.*, 715 F.3d 388 (1st Cir. 2013) ..............................13

*Pagán v. Calderón*, 448 F.3d 16 (1st Cir. 2006) .......................................................50

*Pueblo of Santa Rosa v. Fall*, 273 U.S. 315 (1927)........................................... 18, 19

*Ross v. Bernhard*, 396 U.S. 531 (1970) ...................................................................51

*S&N Equipment Co. v. Casa Grande Cotton Finance Co.*, 97 F.3d 337 (9th Cir. 1996) .........................................................................................................................41

*Smith v. Sperling*, 354 U.S. 91 (1957) .....................................................................52

*Swerdloff v. Miami National Bank*, 584 F.2d 54 (5th Cir. 1978) .............................53

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) ............53

*Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Financial Services Inc.*, 704 F.3d 155 (1st Cir. 2013) ......................... 37, 49, 52

*United Food & Commercial Workers Union v. Zuckerberg*, 262 A.3d 1034 (Del. 2021) ..................................................................................................................37

*United States ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1 (1st Cir. 2015)....47

*United States ex rel. Ge v. Takeda Pharmaceutical Co.*, 737 F.3d 116 (1st Cir. 2013) ..................................................................................................................49

*United States ex rel. Kelly v. Novartis Pharmaceuticals Corp.*, 827 F.3d 5 (1st Cir. 2016) ................................................................................................................ 33, 35

*United States ex rel. Solano v. Barton Associates, Inc.*, No. 25-1309 (1st Cir. May 28, 2026) ..............................................................................................................32

*United States v. Dávila-Félix*, 763 F.3d 105 (1st Cir. 2014)....................................47

## STATUTES

12 U.S.C. § 1972 ..............................................................................................3, 41

12 U.S.C. § 1975 ............................................................................................ 3, 5, 41

14 L.P.R.A. § 4003 ................................................................................................52

14 L.P.R.A. § 4004 ................................................................................................52

28 U.S.C. § 1291 ....................................................................................................4

28 U.S.C. § 1331 ....................................................................................................3

## RULES

Fed. R. App. P. 4(a)(4)(A)(iv) ...............................................................................4

Fed. R. Civ. P. 12(b)(6)........................................................................................49

Fed. R. Civ. P. 15 .................................................................................................31

Fed. R. Civ. P. 23.1 ....................................................................................... passim

Fed. R. Civ. P. 41(a)(1)(A)(i) ..............................................................................25

Fed. R. Civ. P. 59(e)..........................................................................................4, 12

Fed. R. Civ. P. 6(a)(1)(C) ......................................................................................4

**RELATED PROCEEDINGS**

This appeal is related to *Boyd v. López-Vidal*, No. 26-1424 (1st Cir.), an appeal from D.P.R. No. 3:22-cv-01190-GMM. A later action, *Boyd v. Banco Popular de Puerto Rico*, D.P.R. No. 3:26-cv-01066-MAJ-MBA, involves overlapping parties and transactions, as do a Commonwealth collection action, *Banco Popular de P.R. v. Biomass Green Fuels LLC*, No. SJ2024CV04616 (P.R. Ct. First Inst., San Juan), and its consolidated appeal, Nos. TA2025AP00276 and TA2025AP00277 (P.R. Ct. App.) (judgment June 16, 2026; reconsideration denied July 20, 2026). None of those proceedings enlarges the record governing review of the December 22, 2025 judgment.

**INTRODUCTION**

The case ended below with one piece of paper. Banco Popular never signed it; never responded to the complaint it disposed of; and never had to defend the claim it extinguished. The bank simply told the district court that the notice, "operates as a dismissal without the need for any further Order." App. 135, ¶ 8. On July 11, 2025, Roberto Abesada-Agüet, Banco Popular's attorney for over a decade,[1] appeared for GFC Holdings, LLC and Biomass Green Fuels, LLC and filed a one-page notice purporting to dismiss their federal claims against the bank with prejudice. App. 129.

Boyd and Lassers disputed his authority the same week. App. 131. No one ever produced a corporate act authorizing that dismissal. No one produced the engagement agreement that the only Board document in the record said would be negotiated. App. 159. The district court gave the notice effect anyway, dismissed the Companies, and then dismissed Boyd and Lassers on the ground that the claims had belonged to the Companies all along.

Banco Popular never had to defend the claim. Its motion to dismiss had been denied as moot on July 8, 2025—the Second Amended Complaint[2] superseded the pleading that motion attacked. App. 118. Three days later, Atty. Abesada, flouting

---

[1] Atty. Abesada appeared for Banco Popular before this Court in *Reyes-Colón v. Banco Popular de P.R.*, 110 F.4th 54 (1st Cir. 2024), and *Popular Auto, Inc. v. Reyes-Colón*, 922 F.3d 13 (1st Cir. 2019) *see* Fed. R. Evid. 201.He also appeared in numerous foreclosure actions in the Commonwealth Court and the Puerto Rico Federal District Court.
[2] The Amended Complaint had to be filed three days after the initial complaint because of a filing snafu. Docket 6 of 24-1569

1

his conflict of interest, entered a special appearance for the Companies that were suing his client, Banco Popular, moved to disqualify the Companies' counsel, and filed the notice of dismissal—all on July 11. App. 119; App. 120; App. 129. Five days after that, Banco Popular joined the motion to strike, told the court the notice was self-executing and asked to be excused from responding until "Partial Judgment is entered dismissing all claims in accordance with the Companies' Notice of Voluntary Dismissal." App. 134–136 (¶¶ 6, 8, 11). The court held the bank's deadline to answer in abeyance. App. 138.

The court never lifted the abeyance. Banco Popular never responded to the Second Amended Complaint. It never moved to dismiss. When Boyd and Lassers moved to withdraw the notice of dismissal on the Companies' behalf, responses were due August 11, 2025—neither Banco Popular nor Atty. Abesada opposed. App. 151. The court denied the unopposed motion anyway. Add. 14. A federal anti-tying Complaint against a bank was extinguished with prejudice without the bank ever responding to it; with the bank's own attorney "noticing" the dismissal on behalf of the Companies; and without the district court ever finding that an authorized decisionmaker of either Company agreed to dismiss the claim. A motion asking this Court to determine who may speak for the Companies is pending before it.

When Boyd and Lassers answered—within the Rule 59 period, with the complete verified complaint the dismissal said was missing; two sworn verifications;

2

and a defect-by-defect explanation—the court denied relief in a text order calling the filing "futile and untimely." It failed to say which of the five proposed theories was futile, or why.

This appeal turns on three propositions. First, no writing identified in the record specifically authorized anyone to dismiss the Companies' federal claims with prejudice. Second, rejecting Boyd and Lassers's asserted source of authority did not establish Atty. Abesada's different asserted authority, and the district court never found that an authorized decisionmaker approved the surrender. Third, the complete verified proposed complaint supplied the pleading framework the judgment said was missing and stated a claim under the Bank Holding Company Act. On this record, no adequate reason for refusing that amendment is apparent.

**JURISDICTIONAL STATEMENT**

The district court had federal-question jurisdiction under 28 U.S.C. § 1331 because the operative complaint asserted a claim under the Bank Holding Company Act's anti-tying provisions, 12 U.S.C. §§ 1972 and 1975.

This Court has jurisdiction under 28 U.S.C. § 1291. The district court entered an Opinion and Order and a separate judgment on December 22, 2025. Add. 1-25 (App. 262-286). The twenty-eighth day after entry was January 19, 2026, a federal holiday, so Rule 6(a)(1)(C) extended the deadline to January 20. Boyd and Lassers filed their Rule 59(e) motion, the completed proposed Third Amended Complaint and sworn

verifications that day. App. 287; App. 298; App. 375; App. 377. The motion therefore tolled the appeal period. Fed. R. App. P. 4(a)(4)(A)(iv). The court denied the motion on March 10, 2026. Add. 26. Boyd and Lassers filed the notice of appeal on April 1, 2026. App. 400. The judgment disposed of all claims and parties and is final under § 1291, notwithstanding the requested without-prejudice modification of any component resting on Article III.

## QUESTIONS PRESENTED

1. Whether the district court could give with-prejudice effect to counsel's unilateral filing when his actual authority was timely disputed and no writing in the record specifically authorized surrender of the Companies' claims in this action with prejudice.

2. Whether the district court abused its discretion by denying, as "futile and untimely," a timely Rule 59 motion and complete verified proposed complaint that cured every defect the judgment identified and stated a valid claim under the Bank Holding Company Act, when no scheduling order had issued and no basis for finding all proposed claims futile appeared in the record.

3. Whether the court erred by treating Article III injury, claim ownership, statutory causation under § 1975, and Rule 23.1 as a single "standing" inquiry; and whether any dismissal resting on Article III must be without prejudice.

## STATEMENT OF THE CASE

### A. The judgment rests on a disputed surrender of the Companies' claims

Banco Popular twice sought to undo the addition of the Companies—first by moving to set aside the order granting leave to amend and later by joining the motion to strike the Companies' claims and disqualify their counsel. Although Boyd and Lassers did not know it then, Atty. Abesada, who filed the motion to strike and disqualify, had been Banco Popular's attorney for over a decade.

On June 30, 2025, the Members moved for leave to add GFC and BGF as co-plaintiffs. App. 40. The court granted leave on July 2 and directed that the Second Amended Complaint "shall be electronically filed forthwith." App. 53. It was filed that day. App. 57. Banco Popular moved the same day, on an urgent basis, to set the order aside and asked for leave to oppose. App. 54. The court denied that motion the next day. App. 117; *see also* App. 133 (¶ 1) n.1 (Banco Popular's own account of the sequence).

Then, on July 8, 2025, the court denied Banco Popular's motion to dismiss as moot, because the Second Amended Complaint had superseded the pleading it attacked. App. 118. Three days later, on July 11, Atty. Abesada-Agüet entered an appearance for GFC Holdings, LLC and Biomass Green Fuels, LLC, in which the Companies "specially appear[ed]" for two stated purposes: to strike the claims and exhibits filed on their behalf, and to disqualify the Becker-Vissepó firm from

representing them. App. 119; App. 120. The same day, he filed a one-page "Notice of Voluntary Dismissal with Prejudice" surrendering the Companies' claims outright. App. 129. Boyd and Lassers disputed his authority immediately. App. 131; App. 151.

No one produced a case-specific instruction from either Company authorizing dismissal. No one produced the engagement agreement contemplated by the only Board document later placed in the record. No one identified a corporate decision approving surrender of these federal claims with prejudice.

Banco Popular then aligned itself with those filings. On July 16, 2025, it moved to join its own attorney's motion to strike and disqualify. App. 134 (¶ 6) ("BPPR joins the Companies' Motion to Strike at Docket 62."). It told the court that the Notice of Voluntary Dismissal, "pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i) . . . operates as a dismissal without the need for any further Order," so that the Companies' claims were "not cognizable and thus require no response." *Id.* ¶ 8. In the same motion, it asked the court to hold its answer deadline in abeyance until, among other things, "Partial Judgment is entered dismissing all claims in accordance with the Companies' Notice of Voluntary Dismissal." *Id.* ¶ 11. The two positions do not sit together: a notice needing "no further Order" cannot also require a Partial Judgment before the bank must answer.

The district court granted joinder as to Dkts. 62–64 and held "the deadline for defendant to answer the amended complaint . . . in abeyance pending the resolution of the issues raised in Docket Nos. 62-64." App. 138.

The district court nevertheless treated the notice as effective. It first rejected the June 13 Member Consent on which Boyd and Lassers relied to add GFC and BGF and retain different counsel. Add. 9-14. It then treated that rejection as enough to conclude that Atty. Abesada "remains" the Companies' lawyer and to grant his notice. Add. 14. Once the Companies were gone, the court held that Boyd and Lassers could not continue because the principal injuries belonged to the Companies and the operative complaint did not adequately plead a direct or derivative route. Add. 15-22.

That sequence skipped the question on which the judgment depended. Rejecting one side's claimed source of authority does not establish the other side's position. The record still had to connect a general engagement instrument to a permanent surrender of this case. It never did.

### B. The anti-tying allegations and the proposed pleading

GFC is a Puerto Rico limited liability company and BGF's sole member. BGF was formed to develop a renewable-fuel project in Humacao. Add. 1-3. BPPR financed the project and served as Administrative Agent. The operative complaint alleged that BPPR used credit and forbearance to obtain an off-take arrangement

under which BGF would sell renewable natural gas to BPPR below market and transfer environmental benefits. Add. 3-6. The alleged condition was determinative, not merely collateral: BPPR would receive fuel at an extremely favorable price and related environmental and tax attributes while the borrower surrendered market upside in order to get forbearance on missed principal payments, a drawdown of over $800,000 while under multiple defaults and a RICO lawsuit.

The operative complaint already alleged a striking departure from the financing documents: the Credit Agreement required payment-and-performance bonds equal to 100 percent of Direct Costs—$18,679,651 under the Master Budget—but the bond BPPR approved was for only $5 million, obtained after closing with loan money, and no bond for 100 percent of Direct Costs ever existed. App. 77–78 (¶¶ 68–70, 73, 75); Credit Agreement § 3.1(h), App. 504; see Add. 3-4. The proposed complaint did not first introduce that shortfall. The proposed complaint added the rest of that transaction, which Argument II.E addresses.

BPPR itself first argued that Boyd and Lassers could not recover because the claims belonged to GFC and BGF. App. 16. Boyd and Lassers responded by seeking to add the Companies through the June 13 Member Consent. App. 40; App. 46. The court allowed the amendment, and the Second Amended Complaint became operative. App. 57.

## C. The record never supplied case-specific dismissal authority

Atty. Abesada's July 11 motion relied on Board authority but did not attach the instrument by which the Board supposedly retained his firm. App. 120. That motion identified a different firm, Picó Advisors LLC, as "the Companies' corporate counsel." *Id*. at 3. A proposed reply again insisted that litigation decisions belonged to the Board yet produced no engagement agreement and no instructions to dismiss this action. App. 155–157. The March 21 document appeared only later, at App. 159, filed August 11, 2025—a month after the dismissal it was purported to authorize, and nearly five months after Atty. Abesada first appeared. A lawyer who surrenders a client's federal claims with prejudice, and produces the instrument said to empower him only a month later, has not carried a burden; he has answered a demand from his clients' adversary, his principal client.

That one-page paper resolved "that the Board hereby approves the engagement of AB-AG LAW LLC to represent the Companies in all pending litigations, and authorizes the Authorized Signatory to negotiate, execute and deliver any agreement, letter of engagement or related documents necessary to formalize such representation." App. 159. It did not name No. 24-1569. It did not authorize dismissal. It did not authorize dismissal with prejudice. It did not identify the Authorized Signatory. Atty. Abesada never produced the contemplated engagement agreement. Nor is the instrument signed by all of the Board's members: it bears the

9

signatures of two of them, Alexander Borschow and Javier Feliciano,[3] and the signature line for the other, Olmar López Vidal, is blank. App. 159.

The filing itself compounded the problem: the one-page notice invoked a defunct subsection of Rule 41, was signed by Atty. Abesada alone although Boyd, Lassers, and Banco Popular had all appeared, and stated that "[t]he Companies are not requesting the dismissal of the claims filed by the individual plaintiffs." App. 129. Boyd and Lassers moved to withdraw the dismissal; responses were due August 11, 2025, and none was filed. The court denied the motion anyway and dismissed Boyd and Lassers as well. App. 151; Add. 14.

**D. The court adopted another case's ruling without deciding this case-specific question**

On August 14, 2025, the district court held an in-chambers conference. The formal record is the minute entry at App. 197. It reports that the court agreed with an interlocutory order in the separate RICO action and offered two paths: a unanimous stay, or effect for the disputed dismissal followed by briefing on Boyd's and Lassers's standing. App. 197–198.

The RICO order addressed whether the June 13 Member Consent permitted Boyd's and Lassers's lawyers to represent Companies in that action. App. 177–181.

---

[3] This was Mr. Feliciano's first and only appearance as a so-called Board member. His Board membership will be discussed in more detail in a motion regarding the Companies' representation, which appellants will be filing shortly.

10

It did not decide whether Atty. Abesada had actual authority to dismiss this anti-tying action with prejudice. It recognized that this case involved different claims and remained unresolved. *Id*. The district court nevertheless used that interlocutory ruling as the foundation for the rejection of the Member Consent and acceptance of Abesada's dismissal.

On December 22, 2025, the court entered judgment. It rejected the Member Consent under its construction of the Operating Agreement, declared that Atty. Abesada remained appointed counsel, and gave the notice effect. Add. 9-14. It then dismissed Boyd and Lassers under a single "standing" rubric, reasoning that the pleaded injuries principally belonged to the Companies, Boyd had not distinctly alleged a personal injury, and the Second Amended Complaint was unverified and lacked particularized demand allegations necessary for derivative relief. Add. 15–22.

### E. The proposed amended complaint supplied the missing pleading framework

Boyd and Lassers timely moved under Rule 59(e) and attached the complete proposed Third Amended Complaint. App. 287; App. 298. Each signed a verification under oath. App. 375; App. 377. The proposed complaint separately pleaded (1) Boyd's alternative personal claim, (2) derivative claims on behalf of GFC, and (3) double-derivative claims for BGF through GFC. It also invoked Rule

23.1 and Puerto Rico's LLC derivative statutes and alleged, as to each relevant decisionmaker, why demand was excused as futile. App. 361–362 (¶¶ 271–276).

The pleading also addressed the two-level ownership structure. GFC is BGF's sole member. To the extent the claim belongs to GFC, Boyd and Lassers proceed derivatively for GFC. To the extent the claim belongs to BGF, the claim is double derivative: Boyd and Lassers stand in GFC's shoes, and GFC, as BGF's sole member, controls whether BGF pursues its own claim. The proposed complaint joined both Companies and alleged why the decisionmakers at the relevant levels could not impartially decide whether to sue BPPR.

For Boyd, the pleading alleged an alternative personal theory: BPPR's collection action on his written guaranty caused legal expense and personal credit and property consequences. App. 364–365 (¶¶ 288–289, 294). The theory does not depend on denying the guaranty's breadth or on converting lost unit value into personal damages. It depends on whether Boyd suffered a separate injury "by reason of" the alleged tie.

The court denied the Rule 59 motion in a text order. It called the proposed complaint "both futile and untimely," cited *Nikitine v. Wilmington Trust Co.*, 715 F.3d 388 (1st Cir. 2013), only for delay, although there was no scheduling order, and said nothing about the verifications; demand futility; the two-level derivative structure; Boyd's personal allegations; or the elements of the BHCA anti-tying

12

claim. It also did not address whether permanently surrendering the Companies' remaining claim fell within the Board's delegated authority or instead implicated Member approval under Operating Agreement §§ 6.4 and 9.1. Add. 26.

## SUMMARY OF THE ARGUMENT

I. The judgment cannot rest on an unadjudicated surrender of the Companies' claims by a conflicted attorney. A general retainer does not authorize counsel to settle or surrender a client's federal claim, and when actual authority is genuinely disputed the court must take evidence adequate to resolve the dispute before enforcing the lawyer's act. Here, no writing authorized dismissal of this action with prejudice. Banco Popular itself told the district court that the notice was self-executing under Rule 41(a)(1)(A)(i) and required "no further Order"—which leaves only one question, whether an unconflicted, authorized decisionmaker of the Companies filed it. The district court rejected a competing Member Consent but never found that any authorized Company decisionmaker approved the surrender on which judgment depended, and its order granting the notice adjudicated nothing. The dismissal of Boyd and Lassers rests on a distinct legal error and can be reversed outright; the rulings resting on the notice should be vacated, with any remand governed by instructions on the burden of proving authority.

II. The Rule 59 ruling is an independent ground for relief. Boyd and Lassers invoked clear legal error, used the prescribed post-judgment procedure, and attached

13

the complete proposed pleading and sworn verifications. A denial of leave stands only if an adequate reason is apparent from the record. None is apparent here: the proposed pleading advanced materially distinct theories, standing bases, and avenues of relief, and the order pronounced them futile without explaining why. The futility holding is a legal conclusion owed no deference, and it is wrong as to the off-take theory at least, which alleges credit and forbearance conditioned on BGF's supply of below-market fuel and environmental value to the bank. Nor did the district court indicate why the amendment was untimely.

III. The court also collapsed distinct doctrines. Article III asks whether a plaintiff suffered a concrete, traceable injury; claim ownership asks whether the cause of action belongs to the entity; § 1975 asks whether an injury occurred "by reason of" a forbidden tie; and Rule 23.1 governs derivative vehicles. Boyd and Lassers acknowledge that much of the loss is derivative and that the Second Amended Complaint was defective under Rule 23.1—that is why the proposed complaint supplied ordinary and double-derivative paths. Boyd separately pleaded, narrowly and in the alternative, a direct guaranty injury: conditions the bank imposed on him personally, redressable under § 1975 whether or not the Companies were also harmed. That error is legal and can be corrected here, and any dismissal resting on Article III—or on want of authority—must be without prejudice.

14

**ARGUMENT**

## I. THE JUDGMENT CANNOT REST ON THE DISPUTED DISMISSAL WITHOUT A FINDING THAT THE COMPANIES AUTHORIZED IT.

Boyd and Lassers disputed Atty. Abesada's authority as soon as he filed the notice and pressed the point at every stage: a notice of intent to respond the day the notice was filed, App. 131; a written opposition arguing that minority-owner counsel lacked authority to dismiss the Companies' claim, App. 139; a motion to withdraw the dismissal, App. 151; and a sur-reply, App. 199. The case-specific actual-authority issue—that a general engagement did not authorize a dismissal with prejudice—was thus squarely raised below, not a generic governance objection. The district court resolved the issue in the final Opinion and Order. Add. 7-14.

Whether the record established actual authority to surrender a federal claim, and whether the district court was required to inquire, are legal questions this Court reviews de novo; any genuinely disputed historical facts are reviewed for clear error and, if unresolved, call for fact-finding or remand. An objection to an attorney's authority may be raised "at any stage of the case." *Pueblo of Santa Rosa v. Fall*, 273 U.S. 315, 319 (1927). Atty. Abesada's more than a decade of work for Banco Popular gave him a direct conflict with the Companies' interest in prosecuting this claim against the bank.

**A. Atty. Abesada required actual authority to dismiss the Companies' claims, which he could not acquire because of his conflict of interest.**

Three questions must be separate: whether a lawyer is authorized to appear, to manage the litigation, and to surrender the claim outright with prejudice. Authority to do the first two does not supply authority to do the third. A lawyer's general employment does not carry inherent power to surrender a client's federal claim. *Malavé v. Carney Hospital*, 170 F.3d 217, 220-21 (1st Cir. 1999). The decision belongs to the client. *Id*. A settlement or equivalent surrender is ineffective unless counsel possesses actual authority to bind that client. *Id*. at 221-22. A conflict of that kind is not incidental; it bears on the authority itself. A lawyer may not represent a client in a matter directly adverse to another current client absent informed consent. Model Rules of Pro. Conduct r. 1.7(a); see *In re Dresser Indus., Inc.*, 972 F.2d 540 (5th Cir. 1992). The rule sounds in agency: a lawyer is the client's agent, and an agent who acts on behalf of an adverse party in the very transaction does not bind the principal by that act. Restatement (Third) of Agency §§ 8.01, 8.03 (2006). Atty. Abesada purported to surrender the Companies' claims against Banco Popular while Banco Popular was his client; a lawyer conflicted in the transaction itself could not supply the loyal, authorized decision that *Malavé* requires. Atty. Abesada and his firm have served as Banco Popular's counsel of record for over a decade—a matter of public record subject to judicial notice. See Fed. R. Evid. 201; *Reyes-Colón v.*

*Banco Popular de P.R.*, 110 F.4th 54 (1st Cir. 2024); *Popular Auto, Inc. v. Reyes-Colón*, 922 F.3d 13 (1st Cir. 2019).

The procedural consequence follows from the substantive rule. When the existence of actual authority is genuinely disputed, a court may not summarily enforce the lawyer's act. It must take evidence sufficient to resolve the contested facts. *Malavé*, 170 F.3d at 222-23; *Michaud v. Michaud*, 932 F.2d 77, 80-81 (1st Cir. 1991). One side's untested papers are ordinarily not enough where the client-lawyer relationship itself is disputed. *Malavé*, 170 F.3d at 223.

Appearing counsel is ordinarily presumed authorized. But under *Doraleh Container Terminal SA v. Republic of Djibouti*, 109 F.4th 608 (D.C. Cir. 2024), once a party presents "substantial reasons" amounting to "sufficient ground to question the authority," that presumption yields, and the court has no discretion to refuse an inquiry. 109 F.4th at 615 & n.4. Those grounds are present here. The notice did not make a scheduling concession or waive a minor argument; it purported to extinguish the Companies' federal claim with prejudice for the benefit of Abesada's client, Banco Popular. Boyd and Lassers challenged that authority immediately. The blank signature line, the missing engagement agreement, the unidentified Authorized Signatory, and the absence of any case-specific instruction were substantial grounds that required the district court to determine whether an authorized Company decisionmaker approved that surrender before building final judgment on it.

17

The Supreme Court's supervisory rule points the same way. A federal court may require a lawyer, "at any stage of the case," to show authority to represent a purported client. *Pueblo of Santa Rosa*, 273 U.S. at 319. When counsel is found to have lacked authority, the suit "must be dismissed 'without prejudice.'" *Doraleh*, 109 F.4th at 615 (quoting *Pueblo of Santa Rosa*, 273 U.S. at 321). The Supreme Court itself directed that "the dismissal should have been, not upon the merits, but without prejudice to a suit, if properly brought." *Pueblo of Santa Rosa*, 273 U.S. at 321.

The D.C. Circuit applied that rule in *Doraleh*. A law firm there filed suit in a corporation's name; the corporation's court-appointed administrator denied ever authorizing it; and the district court entered judgment without deciding whether the firm was authorized. The court of appeals held that evidence raising substantial questions obligated the court to determine whether the client had authorized the representation, and it vacated the judgment. *Id*. at 615–20. Two features of that decision bear directly on this appeal.

First, an objection to counsel's authority is not subject to ordinary forfeiture rules and may be raised "at any stage of the case," including on appeal. *Id.* at 615. Second, that power belongs to this Court as well as to the district court. The D.C. Circuit held that "the power to inquire into an attorney's authority is possessed concurrently by appellate courts," and that it had "the power and duty to look into an attorney's

18

authority, or direct the district court to look into it, regardless of how the district court exercised its discretion in the first instance." *Id*. at 616 n.5. The consequence of getting it wrong is severe: "[a] suit initiated without authority from the party named as plaintiff is a nullity and any judgment obtained in such a suit is void." *Meredith v. The Ionian Trader*, 279 F.2d 471, 473–74 (2d Cir. 1960), quoted in *Doraleh*, 109 F.4th at 615. What is true of an unauthorized filing must be true of an unauthorized surrender: it too is a nullity, so the claims it purported to extinguish remain pending and must be restored.

**B. The March 21 document did not authorize dismissal with prejudice.**

The record discloses a three-step dismantling of the Companies, and the final step is the one on appeal. First, Banco Popular conditioned credit and forbearance on a below-market off-take—the tie at the heart of this suit. Second, the January 31, 2025 Asset Acquisition Agreement transferred all of the Companies' operating assets—Biomass being GFC's "sole operating subsidiary and only revenue-generat[ing]" asset—and released Banco Popular. The proposed amended complaint alleges that the transfer was itself a "deemed liquidation event" under the Operating Agreement. App. 358–359. Third, the notice of voluntary dismissal extinguished, with prejudice, the anti-tying claim—the principal asset the Companies had left, and the one claim capable of holding Banco Popular to account for the first two steps.

19

That third step was not litigation management; it was a disposition of the enterprise's remaining value for the benefit of Banco Popular, Abesada's real client.

The Operating Agreement draws exactly that line. Section 6.1 vests ordinary management in the Board, but Section 6.4 withholds from the Board, absent Member approval, the authority to "merge or consolidate the Company," to "change the Company's purposes[,] long-term business strategy or scope," or to "liquidate, dissolve or wind up the Company." App. 536. A with-prejudice surrender of the Companies' sole remaining asset is a disposition of that character. Whether or not it is a formal "liquidat[ion]" within Section 6.4(c), it is at least as fundamental as the acts Section 6.4 reserves—and it forecloses the premise on which the judgment rests: that the Board holds plenary authority over everything the Companies do. It does not. Fundamental dispositions belong to the Members. Even on Banco Popular's own theory—that the Board manages the litigation and retained Atty. Abesada—the Board could not approve this surrender without Member approval, and the record contains none. Malavé, 170 F.3d at 220-22. If the Board itself lacked authority to abandon the claim with prejudice, a lawyer acting under a general engagement "in all pending litigations," App. 159, did too. Boyd and Lassers pressed exactly this below, arguing that counsel "representing a minority of the Companies' owners[] purports to dismiss a valid Anti-Tying case," in "violation of the Operating Agreement's requirement for … approval for liquidation." App. 139.

20

The March 21 document cannot bear the weight the judgment placed on it. It generally approves engaging AB-AG Law in pending litigation. App. 159. A general engagement is not actual authority to surrender a claim. *Malavé*, 170 F.3d at 220-22. Nothing in the paper names this action; directs abandonment of the BHCA claim; approves dismissal, much less with prejudice.

The paper also anticipates another document. It delegates to an unidentified "Authorized Signatory" the power to "negotiate, execute and deliver any agreement, letter of engagement or related documents necessary to formalize such representation." App. 159. That agreement would define the client, the scope, the instructions, and the limits of the representation. No executed agreement appears in the record. The district court never identified the signatory, never found that an agreement existed, and never determined its scope. Nor does the paper's ratification clause reach this dismissal: it confirms only "actions heretofore taken by the Authorized Signatory"—that is, actions taken before March 21, 2025. *Id.* The dismissal came on July 11. A ratification of past acts does not authorize a future one.

Finally, the instrument is not executed by all of the Board's members; the signature line for one of them, Olmar López Vidal, is blank. *Id.* App. 119 and the March 21 paper reach, at most, authority to appear. Neither reaches authority to surrender the claim with prejudice.

21

The competing authority instruments likewise must be separated. The June 2 proxy arose from a May 27, 2025 Settlement Agreement among López-Vidal and Ríos Mena, on one side, and Boyd and Lassers, on the other. To implement that settlement, López-Vidal irrevocably appointed Boyd and Lassers as his sole and exclusive proxies for specified GFC voting and written-consent matters concerning the litigation. Combined with Boyd's and Lassers's existing interests, the proxy placed 55.4% of GFC's voting power under their control. They then exercised that authority through the June 13 Member Resolution selecting counsel for this litigation under Operating Agreement § 3.2. GFC, in turn, is BGF's sole member. Those instruments stand independently from the proposed Operating Agreement amendment that was later disavowed. None of this converts a general appearance by counsel into authority to dismiss with prejudice.

Nor did a later document ratify the notice. The July 21 Board memorandum rejected Boyd's and Lassers's subsequent Member Consents, but it did not state that the Companies approved dismissal of No. 24-1569 with prejudice. App. 160. General ratification language in a March 21 instrument could not ratify a July 11 act that had not occurred.

The filing was also irregular on its face, and the irregularity corroborates the authority problem. The notice invoked "Rule 41(a)(1)(ii)"—a subsection that has not existed since the 2007 restyling—while justifying itself by the absence of an answer,

the condition for a notice under Rule 41(a)(1)(A)(i) and the route Banco Popular itself pressed. App. 129; App. 135 (¶ 8). Read as a stipulation under (A)(ii), the filing fails on its face: a stipulation must be "signed by all parties who have appeared," and Boyd, Lassers, and Banco Popular had all appeared, yet only Atty. Abesada signed. Fed. R. Civ. P. 41(a)(1)(A)(ii); see *City of Jacksonville v. Jacksonville Hospitality Holdings, L.P.*, 82 F.4th 1031 (11th Cir. 2023) ("And all means all."). A stipulation missing required signatures is "ineffective, and the claims they purported to dismiss remain pending before the district court." *Id.* Independently, the July 11 notice could not reach the Companies' derivative claims at all. A Rule 41(a)(1) dismissal is by its terms "Subject to Rules . . . 23.1(c)," and Rule 23.1(c) allows a derivative action to be "voluntarily dismissed . . . or compromised only with the court's approval." No court approved this dismissal. Fed. R. Civ. P. 23.1(c).

Read as a notice under (A)(i), it could dismiss with prejudice only because "the notice . . . states otherwise," Fed. R. Civ. P. 41(a)(1)(B)—which makes authorization, not the rule's default effect, the decisive question. Under either subsection the filing could bind GFC and BGF only if an authorized decisionmaker empowered counsel to make it. The district court never resolved that question.

The Members moved promptly to withdraw the dismissal, App. 151. The district court nevertheless denied the unopposed motion, gave the notice effect, and entered judgment. Add. 14, 23.

23

**C. Neither the rejection of a competing consent nor the order granting the notice of voluntary dismissal established Atty. Abesada's authority.**

The Opinion and Order answered one question: it held that the June 13 Member Consent could not bypass the Board under the district court's construction of the Operating Agreement. Add. 9-14. Even if that conclusion were assumed correct, it did not resolve the separate proposition on which judgment depended—that the Board validly retained Atty. Abesada for this action and authorized him to dismiss it with prejudice.

A party that fails to prove the authority of its preferred agent does not thereby prove the authority of its opponent's. Each source must stand on its own.

The record contains no engagement agreement between the Companies and Atty. Abesada's firm, no Board resolution retaining him for this action, no identification of the "Authorized Signatory," and no corporate act of either Company authorizing the surrender of these federal claims—and the district court never found that whoever held that power under the Operating Agreement exercised it. App. 120; App. 159; Add. 14.

Nor did the order granting the notice supply the missing finding. On Banco Popular's own reading, it could not have. The bank told the district court that the notice "operates as a dismissal without the need for any further Order." App. 135 (¶ 8). If that is right, the court's order granting the notice adjudicated nothing: it added

24

no legal effect the notice did not already have, and it tested nothing the notice did not already assume. What the order did do was rest a judgment on the notice— without ever asking the only question a self-executing dismissal leaves open, which is whether "the plaintiff" authorized it. Fed. R. Civ. P. 41(a)(1)(A)(i). An order that gives effect to a filing it never examined is not an adjudication of that filing's validity.

The separate RICO order did not fill the gap. It addressed whether counsel could jointly represent Boyd, Lassers, GFC, and BGF in light of what that court characterized as their historically adverse interests in the separate RICO action. App. 177–181. Any perceived adversity concerned that case; the order did not decide whether the Companies opposed this anti-tying claim or whether Atty. Abesada had authority to dismiss it with prejudice, despite his conflicts. The district court's minute entry shows that it adopted the RICO order's conclusion and then made the effect of the disputed dismissal turn on whether all parties agreed to a stay. App. 197. Unanimity about a stay is not a substitute for client authorization.

This point does not require this Court to choose between the competing governance camps. The Court can assume the Board ordinarily selects litigation counsel and that the Member Consent failed. The judgment still lacks the necessary finding that an authorized Board or other Company decisionmaker approved the permanent surrender of this federal claim. The Agreement's text reinforces that

limited point: Sections 6.1(a) and 6.2 vest management in the Board subject to limitations elsewhere in the Agreement; Section 9.1 separately makes a unanimous member vote a dissolution event. App. 541. The proposed complaint alleges that the January 31, 2025 Asset Acquisition Agreement worked exactly such a disposition without the required consent. See Part B, supra; App. 358–359. Those allegations could not be treated as conclusively valid at the pleading stage.

That textual argument is narrower than saying every alleged fiduciary breach automatically displaces the Board. Section 3.2 permits majority written consent on matters reserved to members, subject to Series A protections. App. 525. 14 L.P.R.A. § 4003 supplies a derivative vehicle when authorized managers refuse to enforce an entity claim or an effort to cause them to act is unlikely to succeed. Those provisions support claim-specific authority and demand analysis; they do not eliminate the need to determine who actually authorized the notice.

**D. The Court should reverse the dismissal of Boyd and Lassers, vacate the rulings resting on the notice of voluntary dismissal, and remand with instructions.**

Relief should track the error, and it is not all of one kind. Two of the rulings below rest on legal conclusions this Court reviews de novo and can correct outright. A third rests on a determination the district court never made, and as to that one the remedy is vacatur and a remand governed by instructions.

26

This Court should reverse the dismissal of Boyd and Lassers' claims. That dismissal rested on a single "standing" holding that folded together Article III injury, ownership of the cause of action, statutory causation under § 1975, and Rule 23.1. Add. 15, 22. Those are four inquiries, not one, and treating them as one is legal error reviewed de novo. No fact-finding is required to say so.

Boyd and Lassers ask this Court to vacate the rulings that rest on the notice, and remand with instructions. The district court declared that Atty. Abesada "remain[ed]" appointed counsel without ever finding that an authorized decisionmaker of either Company retained him for this case or approved a dismissal with prejudice. Add. 9–14. An implicit finding will not do: authority that was timely and repeatedly disputed had to be resolved, not assumed from the entry of judgment on the notice. That is the finding the law required before the notice could be given effect. *Malavé*, 170 F.3d at 222–23. Once Boyd and Lassers presented substantial grounds to question the authority—Part B details them—the court had no discretion to refuse the inquiry. *Doraleh*, 109 F.4th at 615 & n.4. None was ever made, and the order granting the notice cannot supply it: on Banco Popular's own reading the notice needed no order, so the order settled nothing. Nor is the defect harmless: an unauthorized surrender is a nullity, not an error excused by the judgment it produced. On remand, the court should determine who, if anyone, was authorized to dismiss

27

the Companies' claims with prejudice in this case—and whether any conflict was waived or the act ratified—before the dismissal may stand.

This Court may also decide the question itself. The power to inquire into an attorney's authority is held concurrently by the courts of appeals, and it is a duty, not a discretion. *Doraleh*, 109 F.4th at 615 n.4, 616 n.5. Boyd and Lassers do not ask this Court to find contested historical facts. They ask it to hold that no authority was ever shown, and that a with-prejudice dismissal cannot rest on an authority no one produced.

The remaining relief follows: vacate the order denying reconsideration, Add. 26 (App. 399), and require claim-specific review of the complete verified proposed complaint under Rule 59, Rule 23.1, Rule 12(b)(6), and the BHCA; modify any disposition truly resting on Article III to a dismissal without prejudice—as a dismissal for want of authority must be in any event. *Doraleh*, 109 F.4th at 615 (quoting *Pueblo of Santa Rosa*, 273 U.S. at 321). Boyd and Lassers do not ask this Court to install any lawyer as the Companies' counsel. Who may speak for the Companies on appeal will be the subject of a separate motion, and this Court need not reach it to correct the errors in the judgment.

## II. THE RULE 59 ORDER CANNOT STAND BECAUSE THE PROPOSED COMPLAINT SUPPLIED SPECIFIC CURES AND A VALID BHCA CLAIM.

Boyd and Lassers timely sought relief under Rule 59(e), attached the complete proposed complaint, and explained the cures. App. 287; App. 378. Denial of a Rule 59(e) motion is reviewed for manifest abuse of discretion, and district courts have substantial discretion in resolving such motions. *ACA Financial Guaranty Corp. v. Advest, Inc.*, 512 F.3d 46, 55 (1st Cir. 2008). Denial of leave to amend is reviewed for abuse of discretion, and this Court "may affirm if any adequate reason for the denial is apparent from the record." *Acosta-Mestre v. Hilton International of Puerto Rico, Inc.*, 156 F.3d 49, 51 (1st Cir. 1998). But a ruling that amendment would be futile is a legal conclusion, reviewed de novo under the Rule 12(b)(6) standard. *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996). The sufficiency of demand-futility allegations is likewise reviewed de novo. *Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Financial Services Inc.*, 704 F.3d 155, 162 (1st Cir. 2013).

### A. Boyd and Lassers invoked a recognized Rule 59 ground and followed the required procedure.

Rule 59 relief is available to correct a manifest error of law. *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 721-22 (1st Cir. 2014); *ACA*

29

*Financial*, 512 F.3d at 55. That was the ground presented here. The judgment treated failure to prove one asserted source of counsel authority as proof of a different source; collapsed Article III, ownership, statutory causation, and Rule 23.1; and dismissed before evaluating whether a verified derivative pleading could proceed.

Boyd and Lassers also used the correct post-judgment procedure. Once judgment entered, Rule 15 could operate only after the judgment was reopened. *Carrero-Ojeda*, 755 F.3d at 722; *Fisher v. Kadant, Inc.*, 589 F.3d 505, 508-09 (1st Cir. 2009). They therefore paired the Rule 59 motion with the complete proposed pleading and sworn verifications. App. 298; App. 375; App. 377. The filing was not a passing request for leave or a promise to amend later.

Timing reinforces the point, and the diligence question deserves a direct answer. BPPR had argued from the outset that the claims belonged to the Companies. App. 16. But an argument is not an adjudication, and the December 22 judgment was the first ruling to hold the operative pleading deficient for want of verification, particularized demand, or individualized injury. What matters for diligence is the procedural posture. BPPR's motion to dismiss had been denied as moot; its deadline to answer remained in abeyance; no discovery had occurred; and Boyd and Lassers moved within the 28 day Rule 59 window with the pleading that cured every error the court identified. The amended theories neither enlarged discovery, which had not begun, nor altered the shape of the case.

30

The distinction from *Nikitine* runs deeper than arithmetic. There the plaintiff let nearly a year pass, offered "absolutely no explanation," and was, in this Court's words, "scrambling to devise 'new theories of liability [] based on the same facts pled in his original complaint'"—theories that "could and should have been put forward in a more timeous fashion." 715 F.3d at 390-91. This case is nothing like *Nikitine*. The proposed pleading did not repackage old facts into new theories; it answered defects that no order had identified until the judgment itself, and it rested in part on materials that did not exist in the record before: the July 19 draft Third Amendment and the July 20 drawdown certificate, obtained only afterward through the López-Vidal settlement. App. 381–383. The cure followed the ruling in 28 days—before an answer, before discovery, and before any responsive pleading was due. App. 138. The delay here was short and explained, and BPPR identified no prejudice below and can identify none now. Even where a movant bears the burden to explain delay, this Court's rule forbids denying an amendment for delay alone without weighing prejudice. *Hayes v. New England Millwork Distributors, Inc.*, 602 F.2d 15, 19-20 (1st Cir. 1979); *Foman v. Davis*, 371 U.S. 178, 182 (1962).

This filing was the opposite of the "passing request for contingent leave to file an amended complaint" whose denial this Court affirmed in *United States ex rel. Solano v. Barton Associates, Inc.*, No. 25-1309, slip op. at 18 (1st Cir. May 28, 2026) (quoting *Fisher*, 589 F.3d at 510-11). Unlike the *Solano* relators—who tendered no

proposed pleading, explained no cure, and on reconsideration "merely declared" that they could cure, *id.* at 20-21—Boyd and Lassers filed the complete verified complaint, two sworn verifications, and a defect-by-defect explanation tied to each finding in the judgment. App. 298; App. 375; App. 377; App. 378.

**B. No adequate reason for the denial is apparent from this record.**

Two rulings are embedded in that order, and only one of them is discretionary. A district court's failure to recite its reasoning is "not a basis for reversal" standing alone—but only because Foman permits affirmance where a justifying reason is apparent even though undeclared. *United States ex rel. Kelly v. Novartis Pharmaceuticals Corp.*, 827 F.3d 5, 10 (1st Cir. 2016) (quoting *Foman*, 371 U.S. at 182). Where no reason is declared and none is apparent, the rule is the other half of the same passage: "outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion." *Foman*, 371 U.S. at 182, quoted in *Kelly*, 827 F.3d at 10. The question is therefore not whether the district court explained itself; it is whether this record supplies a reason. It does not.

The futility holding is a different matter entirely. It is a legal conclusion, reviewed de novo, and owed no deference at all. Glassman, 90 F.3d at 623. It is wrong as to at least one proposed theory, and this Court can hold so itself rather than remand for the district court to say it first.

32

The order explained one holding and not the other. The proposed pleading advanced materially distinct substantive theories, standing bases, and avenues of relief, each resting on different elements: an off-take theory under § 1972(1)(C); a separate affiliate-product theory concerning Popular Insurance and the bond premium; an ordinary derivative claim on behalf of GFC; a double-derivative claim on behalf of BGF through GFC as its sole member; and Boyd's alternative personal theory arising from the guaranty collection action. Each turns on different facts, different statutory language, and different procedural rules.

The district court pronounced the pleading "both futile and untimely." Add. 26. It then gave a reason for untimeliness—the delay rule of *Nikitine*—and said not one word more about futility. Add. 26. It did not identify a missing statutory element, address causation, distinguish among the theories, or explain why any one of them failed as a matter of law.

A reviewing court cannot supply what was never decided. To affirm on futility, this Court would have to hold that every proposed theory fails as a matter of law— a holding the district court never made and never explained. The order does not disclose which legal rule was applied to which theory, and the record does not answer the question either way. This is not a case in which a single dispositive defect makes the reason obvious: BPPR advanced several arguments in opposition, resting on different grounds, and the order adopted none of them. Add. 26. Where a record

33

supplies competing candidate rationales rather than one apparent reason, no justifying reason "appear[s] for the denial," and the *Kelly* rule does not save the order. Affirmance would require this Court to choose among BPPR's competing arguments and then perform, for the first time on appeal, the claim-specific analysis the district court never undertook. A denial is sustainable on reasons apparent from the record—not on reasons an appellate court must construct for it.

The untimeliness holding rests on half a rule. The district court quoted *Nikitine* for the proposition that "when a considerable period of time has passed between the filing of the complaint and the motion to amend, courts have placed the burden upon the movant to show some valid reason for his neglect and delay." Add. 26 (quoting *Nikitine*, 715 F.3d at 390-91). *Nikitine* drew that language from *Hayes*, 602 F.2d at 19-20—and it is the back half of a sentence whose front half forbids precisely what the district court did: "While courts may not deny an amendment solely because of delay and without consideration of the prejudice to the opposing party, . . . it is clear that 'undue delay' can be a basis for denial." *Id*. at 19. Hayes honored that limitation. It affirmed only after weighing prejudice and finding it substantial: the proposed amendment there added a conspiracy charge "not contemplated by the original complaint," and discovery was already complete. *Id*. at 20. Here, there was no prejudice to weigh. BPPR never answered. App. 138. The district court weighed

34

nothing. A delay rule applied without the prejudice inquiry that conditions it is not the rule this Court announced.

The framework was wrong too. *Nikitine* was decided under the "freely give[n]" standard of Rule 15(a)(2), on a motion for leave to amend filed while fully briefed motions to dismiss were still "under advisement"—before any judgment entered. 715 F.3d at 389-91. Rule 15(a)(2) was not available to Boyd and Lassers. Judgment had already been entered, and a district court "cannot allow an amended pleading where a final judgment has been rendered unless that judgment is first set aside or vacated." *United States ex rel. Ge v. Takeda Pharmaceutical Co.*, 737 F.3d 116, 127 (1st Cir. 2013). The court therefore measured a post-judgment Rule 59(e) motion against a pre-judgment Rule 15 yardstick, and it did so without addressing Rule 59(e) at all. Applying the wrong legal standard is an abuse of discretion. *Gracia-Gracia v. Financial Oversight & Management Board for Puerto Rico*, 939 F.3d 340, 346 (1st Cir. 2019).

The failure to consider the cures itself is the error. The judgment rested on three identified defects: the Second Amended Complaint was unverified; it lacked particularized demand allegations; and Boyd had not distinctly pleaded a personal injury. Add. 21-22. The proposed complaint answered each. An order that demands specific cures and then rejects them without a word does not exercise discretion; it declines to do so. *Foman*, 371 U.S. at 182; *Gracia-Gracia*, 939 F.3d at 346 (failure

35

to consider a material factor is an abuse of discretion). This Court need not decide whether every proposed claim survives Rule 12(b)(6). It need only hold that the record does not make futility apparent as to all of them, vacate the order denying reconsideration, and direct claim-specific analysis. As the sections that follow show, the off-take theory survives.

## C. The proposed complaint repaired verification and demand-futility defects.

Rule 23.1 is procedural. It requires particularized allegations showing either demand and refusal or why demand would have been futile. The substantive dimensions of demand come from the law of the entity's jurisdiction. *Unión de Empleados*, 704 F.3d at 162-63. Because Puerto Rico law follows Delaware corporate principles where local law is silent, demand is excused when particularized facts create a reasonable doubt that the relevant decisionmakers could exercise independent and disinterested judgment. Id. at 163-66. Delaware has since consolidated that inquiry into a single director-by-director test: demand is excused if, for at least half of the demand board, a director received a material personal benefit from the challenged conduct, faces a substantial likelihood of liability on the claims, or lacks independence from someone who did. *United Food & Commercial Workers Union v. Zuckerberg*, 262 A.3d 1034, 1059 (Del. 2021). The proposed complaint's manager-by-manager allegations are built around those factors.

That test is satisfied here on the actual demand to be presented to the board. By January 20, 2026, when Boyd and Lassers tendered the proposed Third Amended Complaint, GFC's board had two managers—Olmar López Vidal and Alexander Borschow. App. 361, ¶ 267. The third, Ernesto Villarini, had resigned on or about February 14, 2025, one week after the Asset Acquisition Agreement closed and its Schedule 2.9 proceeds reached his affiliated entities. App. 362, ¶ 275. Both remaining managers are interested. Borschow, through Semillero, received approximately $1,468,071.36 from that self-dealing transaction—the one that required GFC and BGF to release Banco Popular from any and all claims, including the claims in this litigation, and that López Vidal attests constituted a Deemed Liquidation Event requiring unanimous Member approval under Operating Agreement § 9.1 (which was never obtained). App. 362, ¶ 274. López Vidal was a named defendant in the related RICO action and, as President and CEO of BGF and the Founding Members' Manager of GFC, was a direct participant in the underlying events; a manager who was himself a defendant in litigation arising from the same transactions cannot impartially decide whether the company should sue on them. App. 361–362, ¶ 272; App. 89, ¶ 115. With both members of a two-member board interested, "[n]o disinterested, independent director exists to whom demand could be made," App. 362, ¶ 276, and demand is excused several times over. Unión de Empleados, 704 F.3d at 165-67. Exculpation does not change the result: § 6.5 of the

Operating Agreement shields a manager only for acts "performed or omitted … in good faith … within the scope of the authority conferred," and preserves liability for "gross negligence or willful misconduct." App. 536. Approving a transaction that paid the manager's own entity and released the Companies' principal remaining assets without the required unanimous Member consent is neither, so the substantial-likelihood-of-liability prong survives.

The two-level structure does not make the claim disappear. GFC is BGF's sole member. A GFC member may proceed derivatively for GFC if demand on GFC's decisionmakers is excused. Where the underlying claim belongs to wholly owned BGF, the action is double derivative: the GFC members stand in GFC's shoes to enforce GFC's power, as sole owner, to cause BGF to pursue its claim. *Lambrecht v. O'Neal*, 3 A.3d 277, 282-89 (Del. 2010). The proposed complaint joined both entities, pleaded that GFC is BGF's sole member, and alleged incapacity at the decision-making levels. App. 307, 361–362 (¶¶ 3–4, 271–276). At minimum, those allegations required analysis rather than a global futility label.

The verifications matter too. The district court expressly relied on the absence of verification in the Second Amended Complaint. Add. 21-22. App. 375 and App. 377 supplied that cure. Verification does not prove the merits, but it removes the procedural defects the judgment identified.

### D. The off-take allegations plausibly stated a BHCA claim.

BPPR will note that BGF first floated selling RLNG to the bank in 2019. That is true and immaterial. The 2019 communication was an arm's-length marketing proposal to sell gas at value; it fixed no price, and nothing in it obliged BGF to supply BPPR below market. The actionable condition arose three years later, and only under duress. By July 2022 BGF had missed four consecutive principal payments (App. 89; SAC ¶ 122), was in default to both BPPR and the El Coquí Landfill that was its sole gas source (App. 62), stood roughly a year past the commercial-operation date its landfill agreement set (App. 468), and was the plaintiff in a pending RICO action against BPPR itself (App. 89; SAC ¶ 115). It was in that posture—not in 2019—that BPPR agreed to extend the loan, forbear on the defaults, and advance $1 million more, and did so "in exchange" for an off-take fixing the price at $14/MMBtu, less than half the 2022 market, together with BGF's carbon credits for no separate consideration (App. 93, 98). A borrower's earlier willingness to sell at market does not immunize a lender's later extraction of a below-market supply as the price of forbearance. That is precisely the conditioning § 1972(1)(C) forbids—and the district court's own recitation describes it.

Section 1972(1)(C) forbids a bank from extending credit, varying consideration, or furnishing a service on the condition that its customers provide additional property or services to the bank, except those related to and usually provided with a traditional

39

banking service. 12 U.S.C. § 1972(1)(C). A direct bank customer may sue under § 1975, and the statute does not require a separate showing of market power or consummated anticompetitive effects at the pleading stage. *Amerifirst Properties, Inc. v. FDIC,* 880 F.2d 821, 825-26 (5th Cir. 1989). A § 1972 plaintiff "need not establish the anti-competitive effects of the tie-in or the market share that the defendant possesses." *S&N Equipment Co. v. Casa Grande Cotton Finance Co., 97 F.3d 337, 344 (9th Cir. 1996).* The proposed complaint alleges a nontraditional condition conferring a separate commercial benefit on the bank—a ten-year below-market off-take arrangement and the project's environmental attributes. The statute still requires an imposed condition, but not separate proof of coercion; circumstantial allegations may show it. *Dibidale of Louisiana, Inc. v. American Bank & Trust Co.*, 916 F.2d 300, 305–07 (5th Cir. 1990).

The allegations map onto each statutory component. First, BGF was BPPR's borrower and customer, and BPPR supplied credit and forbearance. App. 307, 365 (¶¶ 3–4, 296). Second, the pleading alleged the condition in terms: BPPR "conditioned its extension of the Third Amendment of the Non-Revolving Credit Agreement and the New Market Tax Credit loan to BGF to an Offtake agreement" supplying the bank fuel "at a less than half of fair market price, plus carbon and environmental credits." App. 315 (¶ 39); see id. ¶¶ 38, 142, 296, 301-302. Third, the Offtake Agreement fixed the contract price at $14.00 per MMBtu for a ten-year

term—a price the pleading alleges was well below prevailing market rates for renewable natural gas. *Id*. ¶¶ 225, 227. The precise spread is a damages question for expert proof at trial, not a pleading requirement. *Id*. ¶ 343. Fourth, the agreement assigned BPPR "any current and future environmental incentives and tax credits"— additional property and services supplied to the bank, not collateral or repayment assurance. *Id*. ¶ 232. Fifth, BGF lost the market revenue and environmental value it gave up. *Id*. ¶¶ 232, 343. Whether BPPR imposed that condition is answered by the sequence.

The Offtake Agreement was executed July 18, 2022. App. 402–425. BPPR transmitted the draft Third Amendment to the Credit Agreement the next day, July 19. App. 426–442. Drawdown Certificate No. 17 and the corresponding Notice of Borrowing, requisitioning $843,257.10, followed on July 20. App. 443–447. The Third Amendment was executed July 26. App. 448–465. BPPR advanced $300,381.72 the following day, July 27, and the $542,875.38 balance on July 29— together, precisely the $843,257.10 requisitioned. App. 466–467. Eleven days separated the off-take from the money.

What BPPR funded is as telling as when. The Third Amendment extended the Non-Revolving Facility Commitment Termination Date to October 31, 2022, defined as the earlier date or the Commercial Operation Date. App. 448–465. The project had never operated and stood roughly a year past the commercial-operation

41

date the record reflects. Drawdown Certificate No. 17 nonetheless certified that no development "materially adversely affects the likelihood of achieving Substantial Completion . . . by the Project Termination Date," and that the remaining cost to completion was $3,593,276.02. App. 443–447 ¶¶ 3.4, 3.7.

An engineer who actually walked the site found otherwise. Venture Engineering, retained and paid by the landfill owner, inspected the Coquí Landfill on July 26, 2022—the day the Third Amendment was executed—and reported on August 3 that the project "was started in 2019 and has not achieved operational status," and that the "overall estimated time frame" to a commissioned and substantially complete project was "20 to 26 weeks." App. 470, 717. Twenty weeks from the July 27 advance runs past mid-December, well beyond the October 31 deadline BPPR had just set for itself.

The Credit Agreement conditioned advances on Independent Engineer review. App. 498–503. The Independent Engineer is a person "engaged by the Administrative Agent and the Lenders, at the cost and expense of the Borrower." Credit Agreement § 1.1; App. 499. Each Notice of Borrowing "shall be delivered together with the corresponding Draw Request Documents . . . and the report of approval of the Independent Engineer," and funds are advanced only after "the receipt and approval of the Draw Request Documents (including the approval of the Independent Engineer thereof)." *Id*. § 2.2(a)(i); App. 500. Advances "shall be made

against certifications, invoices and/or purchase orders duly approved by the Administrative Agent, the Lenders and the Independent Engineer." *Id*. § 2.2(a)(iii); App. 501. Moreover, "[t]he Administrative Agent shall not be required to make any Advance unless the corresponding Draw Request Documents shall have first been approved by the Independent Engineer." *Id*. § 2.2(a)(iv); App. 501. BPPR also held the right to enter the site and inspect the work, at BGF's expense. *Id*. § 5.1(cc)(iii); App. 503. Nothing in the record indicates that any Independent Engineer review preceded the July 27 and July 29 advances. The protection was BPPR's, the engineer was BPPR's to appoint, and BGF paid for both. At the pleading stage, a lender's decision to fund while forgoing the very review its own agreement conditions funding upon plausibly supports the inference that the advances served something other than ordinary protection of its collateral.

BPPR will invoke the rule that § 1972 does not prohibit ordinary measures taken to protect a bank's investment. *B.C. Recreational Industries v. First National Bank of Boston*, 639 F.2d 828, 831-33 (1st Cir. 1981). But *B.C. Recreational* fails BPPR on its own terms. It arose under § 1972(1)(C)—the subsection invoked here—and the claim failed at the threshold because the thing demanded never ran to the bank. The consultant the bank installed "had [no] financial connection with either the Bank or FNB," so his retention was not "additional credit, property, or service to such bank . . . no matter how broadly those terms are construed," and it was in any event

43

"done in order to protect the Bank's investment." Id. at 832-33. The condition alleged here is the opposite. A ten-year below-market off-take and the project's environmental attributes are consideration running to BPPR itself—not collateral, not a compensating balance, not repayment assurance, and not any other traditional protection. A bank that takes a decade of discounted fuel and the carbon credits is not protecting its collateral. It is tying its loan to a commercial advantage.

The pleaded facts describe the opposite of investment protection. A lender protecting its collateral does not advance $843,257.10 into a project that has never operated, that is a year past its commercial-operation date, that an independent engineer places 20 to 26 weeks from substantial completion, and that must finish by a deadline the lender itself set for October 31—all while declining the Independent Engineer review its own agreement affords it. Those advances do not plausibly reflect credit protection. They plausibly reflect consideration.

BPPR's own precedent does not help it either. In *Executive Leasing Corp. v. Banco Popular de Puerto Rico*, 48 F.3d 66 (1st Cir. 1995), this Court affirmed summary judgment against a § 1972 plaintiff—but on a ground that is absent here. The exclusive-dealing condition alleged there "d[id] not appear in the loan agreement," which contained an integration clause. *Id*. at 68. The claim therefore died under Puerto Rico's parol evidence rule: the plaintiffs' extrinsic evidence was offered not to illuminate the circumstances of the bargain "but to contravene an

44

express term of the agreement." *Id*. at 70. Nothing of the sort is true here. The alleged condition does not depend on oral evidence contradicting an integration or anti-exclusivity term. Boyd and Lassers rely on the signed Offtake Agreement, the written credit and draw documents, and their sequence and interrelationship to support the inference that BPPR conditioned credit on the off-take. Executive Leasing also decided nothing about § 1972(1)(D): the panel held that theory "waived" for inadequate briefing and expressly "need not decide whether the workout of the loan constituted an 'exten[sion of] credit' within the meaning of the BHCA." *Id*. at 70-71 & n.7. A case that excluded the plaintiff's evidence and waived his affiliate theory establishes no rule that defeats a plaintiff whose condition appears in the writing and whose affiliate theory is pleaded.

The pleading also alleged concrete loss caused directly by the condition: BGF surrendered its carbon and environmental credits to BPPR for no separate consideration and committed a decade of output at less than half the market price. App. 350, 372 (¶¶ 232, 343); App. 93 (alleging a $14/MMBtu price less than half the 2022 market). Those are completed transfers of value, not merely lost profits contingent on operation. Whether every dollar can be proved is a damages question for later. The off-take theory stated a claim.

Because futility is a legal question this Court reviews de novo under the Rule 12(b)(6) standard, *Glassman*, 90 F.3d at 623, the Court need not return the

45

sufficiency of the off-take theory to the district court to decide in the first instance. This Court may hold that the proposed Third Amended Complaint states a claim under 12 U.S.C. § 1972(1)(C) and, under 28 U.S.C. § 2106, "direct the entry of such appropriate … order, or require such further proceedings to be had as may be just"— namely, that the district court accept the Third Amended Complaint as the operative pleading and proceed. So directed, the mandate rule forecloses any renewed motion to dismiss the off-take theory on remand. *United States v. Dávila-Félix*, 763 F.3d 105, 109 (1st Cir. 2014). This Court has done as much before in *Maroni v. Pemi-Baker Regional School District*: it reversed a judgment of dismissal and, because the denial of leave rested on a legal error that once corrected left no room to deny amendment, "direct[ed] that the motion to amend be allowed" rather than returning the question below. 346 F.3d 247, 259 (1st Cir. 2003). The posture is the same here: the only stated ground for denying leave as to the off-take theory was futility—a legal question reviewed de novo—and if the theory states a claim, that ground disappears. This is therefore not the ordinary case in which amendment discretion "should normally be exercised in the first instance by the district court, not by the court of appeals." *United States ex rel. Gadbois v. PharMerica Corp.*, 809 F.3d 1, 6-7 (1st Cir. 2015). There, the court declined to direct supplementation precisely because the district court had not yet exercised its Rule 15 discretion; here it did—it adjudicated futility—and that legal determination is now squarely under de novo

46

review. Should the Court prefer not to direct acceptance outright, the alternative is a remand requiring the district court to apply the correct standards and state claim-specific reasons for any renewed denial.

## E. The proposed complaint materially expanded the bond-and-insurance allegations.

The bond shortfall itself was not new; the Second Amended Complaint had already alleged it. App. 77–78 (¶¶ 68–70, 73, 75); Credit Agreement § 3.1(h), App. 504. What the proposed complaint added was the rest of the transaction: the bond was written by Mapfre "with Popular Insurance as the agent"; "Popular Insurance is wholly owned by Popular, Inc., which also owns BPPR"; and the premium was paid out of BGF's own loan proceeds for a bond covering the Lopezes' joint venture rather than BGF. App. 320, 325–326 (¶¶ 75–77, 92–98). Those allegations alone defeat the premise that the proposed pleading merely repeated what came before.

The district court could have identified a missing statutory link, addressed causation, or separated the viable theories from the rest. It did none of those things. That is why the record does not make futility apparent since the amendment was not futile. It is also why the order cannot stand.

**F. No alternative ground supports affirmance.**

Even if this Court reaches the pleading's merits, no independent ground permits affirming the denial of leave. *Kelly*, 827 F.3d at 10; supra Part B. Claim ownership and § 1975 causation are addressed in Argument III; Rule 23.1 is satisfied manager by manager, as Part C explains; and the off-take theory states a claim, as Part D explains. Nor can the 2019 marketing proposal support affirmance: the district court dismissed on standing, so the proposal was never a ground of decision and cannot become one for the first time on appeal. Add. 15-22.

## III. ARTICLE III, CLAIM OWNERSHIP, STATUTORY CAUSATION, AND DERIVATIVE PROCEDURE ARE DISTINCT INQUIRIES.

Boyd and Lassers opposed BPPR's standing motion, filed memoranda at App. 224 and App. 238, and presented the direct and derivative alternatives again under Rule 59. The district court decided the issue at Add. 15-22. Article III and Rule 12(b)(6) rulings are reviewed de novo. *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 730-31 (1st Cir. 2016).

### A. Article III injury does not decide who owns the cause of action.

Article III asks whether the plaintiff alleges a concrete injury fairly traceable to the defendant and likely redressable by a favorable decision. The shareholder-standing rule asks who owns the claim. The First Circuit has treated the latter as a

48

prudential limitation, not part of Article III's irreducible minimum. *Gianfrancesco v. Town of Wrentham*, 712 F.3d 634, 637 (1st Cir. 2013).

That distinction does not give every member a personal BHCA claim. *Gianfrancesco* did not decide whether the shareholder-standing rule ultimately barred recovery; it held only that actual financial harm could satisfy Article III even where ownership of the cause of action remained separate. *Id*. at 637-39. The same disciplined use is appropriate here.

Boyd and Lassers acknowledge that diminished unit value and losses first sustained by GFC or BGF belong to the entity. *Pagán v. Calderón*, 448 F.3d 16, 28-30 (1st Cir. 2006). They acknowledge too that the Second Amended Complaint did not satisfy Rule 23.1. Those are pleading defects. They are not a constitutional absence of injury, and they do not answer whether the proposed verified complaint supplied the proper representative vehicle.

Section 1975 adds another inquiry. A plaintiff must be injured in business or property "by reason of" conduct forbidden by § 1972—a directness requirement drawn from the antitrust laws. *Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440, 444-45 (5th Cir. 1986); see *Associated General Contractors v. California State Council of Carpenters*, 459 U.S. 519 (1983). That requirement may defeat a claim even where Article III exists, but whether the tie caused the plaintiff's injury is ordinarily a question of fact, not a pleading-stage bar. *Costner v. Blount National*

49

*Bank*, 578 F.2d 1192, 1196 (6th Cir. 1978). Rule 23.1 then governs how an entity-owned claim may be pursued derivatively. These doctrines ask different questions, apply different standards, and produce different judgments. The judgment below ran them together, treating a pleading defect under Rule 23.1 as though it were a constitutional absence of injury.

**B. The entity claims proceed through ordinary and double-derivative paths.**

At the threshold, the representative posture must be stated correctly. In a derivative action the corporation is the real party in interest—"the stockholder being at best the nominal plaintiff." *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 522-23 (1947); *see also Ross v. Bernhard*, 396 U.S. 531, 538 (1970) (the claim "is that of the corporation"). Boyd and Lassers therefore sue to enforce GFC's and BGF's own causes of action; they do not appear as the Companies' agents, and the Companies are properly aligned as nominal parties in addition to their own claims.

The proposed complaint's representative structure should be analyzed entity by entity. For injury to GFC, Boyd and Lassers proceed as GFC members derivatively on GFC's behalf. For injury to BGF, the structure has two levels because GFC wholly owns BGF. Boyd and Lassers proceed in GFC's shoes, while GFC's ownership supplies the power to cause BGF to enforce its claim. That is the familiar double-derivative form. *Lambrecht*, 3 A.3d at 282-89.

50

Demand must likewise be tied to the relevant decisionmakers. Rule 23.1 requires particulars, not slogans. *Unión de Empleados*, 704 F.3d at 162-67. The proposed complaint identified the challenged Board's relationship to the BPPR release, refusal to pursue BPPR, asserted benefits from the asset transaction, and support for counsel's effort to terminate the claim. App. 361–362 (¶¶ 271–276). At the pleading stage, those allegations had to be evaluated under the correct legal test. Puerto Rico's derivative-action provision, 14 L.P.R.A. § 4003, addresses the vehicle when managers with authority refuse to act or an effort to cause action is unlikely to succeed; it does not transform derivative injury into personal injury. Section 4004 requires only that the plaintiff be a member both when the action is brought and when the transaction complained of occurred. Boyd and Lassers satisfy both conditions. 14 L.P.R.A. § 4004.

Both Companies are necessary to the representative structure. Removing GFC and BGF based on unadjudicated counsel authority did not merely simplify the caption. It removed the entities whose rights Boyd and Lassers sought to enforce and then made their absence the premise for dismissing the remaining plaintiffs. In a derivative suit the corporation is an indispensable party to be aligned—as a defendant if present management opposes—not dropped. *Gabriel v. Preble*, 396 F.3d 10, 13–15 (1st Cir. 2005); *Smith v. Sperling*, 354 U.S. 91, 97 (1957). Because

51

jurisdiction here rests on a federal question, not diversity, realignment raises no jurisdictional bar.

### C. Boyd's personal theory is an alternative, not a necessary ground.

Boyd's guaranty theory is narrow. A guarantor does not acquire an individual claim simply because the bank can collect from him. *Mid-State Fertilizer Co. v. Exchange National Bank of Chicago*, 877 F.2d 1333, 1336 (7th Cir. 1989). Nor can Boyd recast GFC's or BGF's losses as personal injury merely because those losses increased the risk of collection.

The verified pleading alleged several consequences, but the direct-injury inquiry requires sorting them. The collection litigation named Boyd in his capacity as a personal guarantor and caused him legal expense, credit injury, property consequences, and direct enforcement exposure. App. 364–365 (¶¶ 288–289, 294) (alleging that BPPR "sued Boyd personally for $12.1M," that his credit was damaged, and that Credit Amendments 1-7 "expanded Boyd's guaranty obligations without his consent"). Those injuries are personal if they were caused by the forbidden condition rather than merely by BGF's default. By contrast, lost salary or distributions, a pro rata share of off-take losses, failure to pursue the bond, and diminished unit value ordinarily belong to the Companies under *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033, 1039 (Del. 2004), and *Pagán*, 448 F.3d at 28-30.

That narrow theory finds support in *Swerdloff v. Miami National Bank*, 584 F.2d 54, 59–60 (5th Cir. 1978), which held that shareholder-guarantors of a closely held borrower, on whom the bank imposed its conditions directly, were "customers" in their own right whose injury "could be redressed under § 1975, whether or not there had been damage to the corporation." Even *Mid-State* preserves that path: guarantors who "suffer direct injury—injury independent of the firm's fate," it holds, "may pursue their own remedies." 877 F.2d at 1336. The theory does not make every entity injury personal. Nor does the relief sought depend on accepting Boyd's alternative: the derivative and double-derivative claims independently require analysis under the verified proposed complaint.

### D. Any true Article III dismissal must be without prejudice.

The district court introduced its discussion as a duty to confirm Article III jurisdiction and ended by saying Boyd and Lassers "lack standing." Add. 15, 22. If that conclusion truly rested on Article III, the disposition cannot be with prejudice. A dismissal for lack of constitutional standing must operate without prejudice because a court without jurisdiction cannot enter a merits judgment. *Hochendoner*, 823 F.3d at 736-37.

If the ruling instead rested on claim ownership, § 1975 causation, or Rule 23.1, those are merits or procedural issues governed by their own standards and subject to the proposed amendment. The judgment cannot be jurisdictional when defending the

53

court's power and merits-based when seeking preclusion. At minimum, this Court should modify any Article III component to be without prejudice. The unauthorized-surrender ground reaches the same result through a different door. An unauthorized dismissal is a nullity, so the claims it purported to extinguish remain pending and must be restored, not adjudicated on the merits; at a minimum the with-prejudice judgment entered on the notice cannot stand. *Malavé*, 170 F.3d at 223 (vacating and remanding rather than dismissing). Only if the Court instead concludes that the Companies were never authorized to press these claims at all does the separate rule apply that any such dismissal must be "without prejudice." *Doraleh*, 109 F.4th at 615 (quoting *Pueblo of Santa Rosa*, 273 U.S. at 321).

**CONCLUSION**

Appellants very respectfully ask this Court to: (1) reverse the dismissal of Boyd and Lassers; (2) hold that no actual, case-specific authority to dismiss the Companies' claims with prejudice was ever shown, vacate the portions of the judgment that rest on the notice, and restore the Companies' claims—or, if the Court prefers, remand with instructions to require Atty. Abesada to show his authority and lack of a conflict of interest, and without treating the invalidity of the Members' Written Consent as affirmative proof of it; (3) vacate the order denying reconsideration, hold on de novo review that the proposed Third Amended Complaint states a claim under 12 U.S.C. § 1972(1)(C), and—under 28 U.S.C. §

54

2106—direct the district court to accept that pleading as operative and proceed, so that the mandate rule forecloses a renewed motion to dismiss the off-take theory, Dávila-Félix, 763 F.3d at 109; as to the remaining theories, require claim-specific analysis under Rule 59, Rule 23.1, and Rule 12(b)(6); and (4) modify any disposition resting on Article III to a dismissal without prejudice, the claims otherwise being restored rather than dismissed. The supplemental Puerto Rico claim should be restored only if a federal claim survives.

Respectfully submitted,

/s/ Jane A. Becker Whitaker
Jane A. Becker Whitaker
First Circuit Bar No. 35763
P.O. Box 9023914
San Juan, PR 00902-3914
Tel. (787) 585-3824
jbw@beckervissepo.com

/s/ Luis E. Miñana
Luis E. Miñana
First Circuit Bar No. 118149
ESPADA, MIÑANA & PEDROSA LAW OFFICES, P.S.C.
122 Calle Ing. Manuel Domenech, Altos
San Juan, PR 00918
Tel. (787) 402-2226
minanalaw@yahoo.com

Counsel for Appellants Gregory Boyd and Jonathan Lassers, individually and derivatively on behalf of GFC Holdings, LLC and Biomass Green Fuels, LLC

55

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,861 words, excluding the parts of the brief exempted by Rule 32(f). It complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it was prepared in 14-point Times New Roman, a proportionally spaced serif typeface. This certificate is furnished under Rule 32(g)(1). The word count was calculated using the word-processing program used to prepare the brief.

/s/ Jane A. Becker Whitaker
Jane A. Becker Whitaker

56

**CERTIFICATE OF SERVICE**

I certify that on July 23, 2026, this brief was filed through the First Circuit's CM/ECF system. All registered counsel will receive notice and service through that system.

/s/ Jane A. Becker Whitaker
Jane A. Becker Whitaker

57

**ADDENDUM**

# TABLE OF CONTENTS

Opinion and Order, ECF No. 131 (Dec. 22, 2025).......................................Add. 1

Judgment, ECF No. 133 (Dec. 22, 2025).....................................................Add. 25

Order Denying Reconsideration, ECF No. 140 (Mar. 10, 2026)...............Add. 26

12 U.S.C. § 1972(1) ....................................................................................Add. 27

12 U.S.C. § 1975 …………………………………………..……….Add. 28

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

GREGORY BOYD; ET AL.,

    Plaintiff,

        v.                           **CIVIL NO. 24-1569 (PAD)**

BANCO POPULAR DE PUERTO RICO,

    Defendant.

**OPINION AND ORDER**

This is an anti-tying case under the Bank Holding Company Act, 12 U.S.C. §§ 1841, et seq. ("BHCA"). Original plaintiffs Gregory Boyd and Jonathan Lassers are members of newly added co-plaintiff GFC Holdings LLC ("GFC"), the sole owner of fellow newly added co-plaintiff Biomass Green Fuels, Inc. ("BGF"), a company organized to build a biorefinery to convert landfill gas to renewable liquid natural gas ("RLNG"). In the main, they allege that defendant Banco Popular de Puerto Rico ("BPPR") conditioned a loan to BGF and a subsequent forbearance on collection of that loan, on the execution an off-take agreement pursuant to which BGF would sell RLNG to BPPR at below-market rates.[1] Presently before the court are three issues: (1) whether GFC and BGF are proper parties here; (2) whether Boyd and Lassers have standing to assert the claims they make; and (3) whether certain exhibits should be struck or restricted. For the reasons explained below, the case must be dismissed and the exhibits restricted.

---

[1] Additionally, almost as a throw-away, the operative complaint (Second Amended Complaint or "SAC") includes a supplementary claim under Puerto Rico law to the effect that BPPR's actions "breached the fiduciary duties it assumed as Administrative Agent for its loan and Disbursing Agent for the NMTC loan." See, Docket No. 57, pp. 58-59; ¶¶ 255-257. More on this later.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 2

## I.     FACTUAL BACKGROUND

The disputes underlying this action are complicated; extend across a number of years; and have resulted in various lawsuits. The SAC is 60 pages long and contains a whopping 89 exhibits. So, following is a summarized background of the SAC's well-pleaded allegations.

### A. GFC and its Members

GFC is a limited liability company ("LLC") organized under the laws of the Commonwealth of Puerto Rico. See, Docket No. 57, p. 9; ¶ 3. It is the sole owner of BGF, another Puerto Rico LLC. Id., p. 9; ¶¶ 3-4. In turn, Boyd and Lassers are founding members of GFC, owning, respectively, 4,252,500 Class A Common Units (17.657% of voting units) and 675,000 Class A Common Units (2.803%). Id., p. 9; ¶¶ 4-5. Olmar López-Vidal, a fellow founding member, was the CEO of BGF during the relevant time-period. See, id., p. 8. From September 14, 2020, until May 26, 2025, he owned 4,725,000 Class A Common Units (23.6250% of voting units) of GFC. See, Docket No. 52-7, p. 51. His father, Olmar López-Gómez was also a member of GFC and owned—for the same time period— 3,037,500 Class A Common Units (15.1875%). Id.[2]

### B. Initial Marketing of an Offtake Agreement With BPPR

By March 22, 2019, BPPR and BGF were discussing a potential loan for BGF to build a biorefinery and the possibility of BGF selling RLNG to BPPR. See, Docket No. 57, p. 5. With this in mind, on September 26, 2019, López-Vidal sent BPPR a proposal to sell it RLNG. See, Docket Nos. 48-2; 49-11. In particular, he proposed a transaction by which BPPR would provide a permanent loan and a New Markets Tax Credit Loan to BGF, while BGF would sell BPPR RLNG

---

[2] On May 26, 2025, López-Gómez transferred his membership units in GFC to López-Vidal thus giving him a total of 7,762,500 Class A Common Units (32.231%). Docket No. 47-1, p. 6.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 3

at a rate of $13.50 per MBTU with a minimum of 800-900 MMBTU's per day. See, Docket No. 48-2, p. 20. Further, he offered to provide "about $5.5 million in RLNG to BPPR" with a principal and interest payment "of about $2.4MM a year." See, Docket No. 49-11.

## C.  Financing BGF's Biorefinery

In 2019, BGF applied to several banks for a construction loan to build a biorefinery. Id., pp. 13 & 18; ¶¶ 21 & 46.[3] On November 13, 2019, BGF received a term sheet from BPPR. Id., p. 4. Ultimately, BGF obtained, among other sources of funds, an $11,869,250 construction loan from BPPR as lender and administrative agent.[4] Boyd provided his personal guaranty as collateral to the loan. Id., p. 9; ¶ 4. Additionally, GFC accepted investments of $4,500,000 and $2,000,000, respectively, from Semillero Investment Fund I, LLC ($4,500,000) and the Puerto Rico Fund for Growth, L.P. ($2,000,000), in exchange for Series A Preferred Units. See, id., pp. 10 & 12; ¶¶ 10 & 17.

## D.  Red Flags at Closing Ignored by BPPR

Unbeknownst to Boyd and Lassers, López-Vidal and López-Gómez wanted to award the construction contract to one of their own companies, International Technical Services, Inc. ("ITS"). See, id., pp. 18-19; ¶¶ 48-58.[5] But ITS was not credit worthy and was unable to obtain a payment and performance bond. Id. Moreover, ITS and López-Gómez were sued in 2018 by Ballester Hermanos, Inc., whose president Alejandro J. Ballester, is a member of BPPR's holding

---

[3] A biorefinery is a facility that processes landfill gas into purified products including RLNG. Id., p. 13; ¶ 21.

[4] The SAC does a poor job of explaining this, but review of the operative complaint in a related action before Judge Méndez-Miró- see below -makes clear that GFC also obtained a $ 7,200,000 New Markets Tax Credit Loan from PCE-SUB CDE 13, LLC, a wholly owned subsidiary of BPPR, and Capital One as lenders, and BPPR as distribution agent.

[5] López-Vidal, his brother, Carlos López-Vidal, and their father, López-Gómez, also own other companies besides ITS. See, Docket No. 57, pp. 12 & 18; ¶¶ 15 & 48.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 4

company's Board of Directors and a member of its Audit Committee, for non-performance on an energy project and failure to refund a deposit. Id., pp. 19-20; ¶¶ 59-60. To boot, ITS lacked the experience to build a biorefinery. Id., p. 20; ¶ 61. To gloss over these weaknesses, the Lopezes proposed that the construction be carried out by a joint venture between ITS and Accurate Solutions Corp. ("ASC") named JV Distributed Power Innovators (the "JV"). Id., pp. 12 & 19; ¶¶ 15 & 57. Despite these anomalies, BPPR allowed the JV to be the designated contractor to build the biorefinery, and approved the loan, which closed on September 15, 2020. Id., pp. 23 & 32; ¶¶ 80 & 111. But that was not the end of the story.

The Credit Agreement required a Payment and Performance Bond of not less than 100% of the direct costs of the project, or $18,679.651. Id., p. 21; ¶¶ 68-73. Instead, BPPR allowed the posting of a mere $5,000,000 payment and performance bond. Id., p. 22; ¶ 75. BPPR then deliberately withheld this information from BGF's investors. Id., p. 22; ¶ 76. Similarly, a condition precedent to closing was that the JV had to provide proof of having paid for and obtained a payment and performance bond. Even so, the JV did not acquire the bond prior to closing but rather, after closing, with the proceeds of BGF's own loan. Id., p. 32; ¶ 111. Moreover, BPPR officer Joval Rodríguez hid the disbursal from Boyd and other investors as a "closing cost." Id., p. 26; ¶¶ 87-89. And by allowing this payment to take place, BPPR failed to comply with the Credit Agreement and to follow its own disbursal controls. Id., p. 32; ¶¶ 109-113.[6]

---

[6] Another anomaly raised by the SAC is that whereas the Small Business Administration ("SBA") and U.S. Department of Agriculture ("USDA") conditioned the provision of guarantees for the loan on BGF having Offtake Agreements with good-credit buyers in place and the lender being able to secure a lien over such agreements, BPPR did not require any such agreement to be in place. Id., p. 20, ¶ 65. This, because (allegedly) BPPR planned on obtaining an offtake agreement for its own facilities. Id., p. 20, ¶ 66.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 5

**D. The RICO Action**

Against this backdrop, on April 25, 2022, Boyd and Lassers sued multiple parties including the Lópezes, BPPR, and the Series A investors for, *inter alia*, violations of the Racketeer Influenced Corrupt Organizations ("RICO") Act. Id., p. 33; ¶ 115. That case, titled Boyd v. López-Vidal, Civil No. 22-1190 ("the RICO Action"), is presently before Judge Méndez-Miró. The Lópezes reacted to the complaint by paying over $1.1MM to suppliers, despite those payments being due only on completion, in exchange for commissions for themselves. Id., p. 33; ¶¶ 116-120. From April to June 2022, BGF missed four principal payments. Id., p. 33; ¶ 122. The biorefinery was still not complete and, with the $1.1 million that the Lópezes had paid out, there were not enough funds to complete the project. Id., pp. 33-34; ¶¶ 121-125.

**E.  The Offtake Agreement**

On July 18, 2022, BPPR and BGF executed an offtake agreement under which BGF would provide BPPR with RLNG at $14/MMBtu which was less than 50% the average market RLNG price for 2022. See, id., pp. 35-37; ¶¶ 132-142. Another abnormally beneficial term for BPPR was that the carbon credits that BGF would obtain from producing the RLNG that would be sold to BPPR, which would normally be sold by BGF for profit, would be transferred to BPPR for seemingly no other overt consideration. See, id., pp. 35 & 41-42; ¶¶ 133 & 170-175. In exchange, BPPR would extend the loan, grant forbearance on defaults, and extend an additional $1MM in credit. See, id., p. 7. A week later, on July 25, 2022, BPPR and BGF executed a Third Amendment to the Credit Agreement. See, id., p. 23; ¶ 80. The Amendment falsely denied or omitted that BGF was in default with BPPR as well as with the Landfill from which it would source the gas it would convert to RLNG. See, id., p. 7. More important, if BGF obtained an additional $1.5 million in equity investment, BPPR would give to BGF benefits amounting to over $3MM. See,

Add. 5

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 6

id., p. 36; ¶ 136. And the Amendment extended the completion date of the biorefinery and allowed

BPPR to pay itself interest with loan proceeds. See, id., pp. 38-40; ¶¶ 148-160.

## F.  The End of the Relationship

By mid-2023, BPPR realized that the biorefinery would not be completed under the

Lopezes. See, id., pp. 40-41; ¶¶ 161-165. So, on May 22, 2024, BPPR took estoppel on 100% of

the assets of GFC and BGF and filed a collection lawsuit against BGF and GFC as well as the

Lópezes and Boyd as personal guarantors. Id., p. 44; ¶¶ 185-186. Boyd filed a counterclaim in

that case. Id., p. 54; ¶ 225. Early in 2025, BPPR sold the loan to VRM-Penzini, a private equity

firm, despite a better offer from Cambrian Energy. Id., p. 54; ¶¶ 226-227. Finally, an Asset

Acquisition Agreement was executed on February 7, 2025, in which VRMP purchased essentially

all of BGF's assets for $4.4 million. Id., p. 54; ¶ 228.

## II.    PROCEDURAL BACKGROUND

On December 9, 2024, Boyd and Lassers initiated this action. See, Docket Nos. 1 & 7.[7] In

that version of the complaint, they claimed entitlement to a share of BGF's alleged damages based

on "their respective percentage ownership in [GFC]" (Docket No. 7, p. 46). On February 7, 2025,

BPPR requested dismissal for lack of standing and failure to state a claim upon which relief may

be granted (Docket Nos. 20; 31).[8] Plaintiffs opposed the request (Docket No. 38); BPPR replied

(Docket No. 42); and plaintiffs sur-replied (Docket No. 46). On June 30, 2025, Boyd and Lassers

filed a motion for leave to amend their complaint to, among other things, join GFC and BGF as

---

[7] Boyd and Lassers filed an Amended Complaint on December 12, 2024–barely three days after filing the original complaint–for the sole purpose of redacting some financial account numbers. See, Docket Nos. 5-7.

[8] The original motion to dismiss (Docket No. 20) contained Spanish-language exhibits. Accordingly, the court ordered BPPR to re-file the motion with all the corresponding certified translations once the latter were obtained. See, Docket No. 24. BPPR did so (Docket No. 31).

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 7

plaintiffs. See, Docket No. 47. This would ostensibly nullify BPPR's lack of standing argument to dismiss.

As authorization to act on behalf of GFC and BGF, they proffered a "Written Consent" executed by a majority of the Common Unit Holders of GFC (Docket No. 47-1) which purported to authorize GFC and BGF to join this case as plaintiffs; terminate the legal representation of GFC and BGF by Attorney Roberto Abesada; and replace him with Attorneys Jane Becker and Jean Paul Vissepó —current counsel for Boyd and Lassers. The motion for leave to amend was granted, resulting in the SAC. See, Docket No. 57. Shortly thereafter, however, Attorney Abesada entered an appearance, asserting that the Written Consent on which counsel relied to purport to represent GFC and BGF was invalid, and that he was the true and proper legal representative of GFC and BFG (Docket No. 61). As such, he filed a Notice of Voluntary Dismissal (Docket No. 63) and a motion to strike certain exhibits filed in support of the SAC (Docket No. 64). Boyd and Lassers opposed those requests. (Docket Nos. 76; 77; 82). Attorney Abesada replied (Docket No. 85); and Boyd and Lassers sur-replied (Docket No. 109).

On August 6, 2025, the court scheduled a motion hearing for August 14th. See, Docket No. 87. Just two days prior to the hearing, Attorney Abesada informed the court that Judge Méndez-Miró had issued a Memorandum and Order in the RICO Action. See, Docket Nos. 94 and 94-1 (copy of Judge Méndez-Miro's Memorandum and Order). In that action, Boyd and Lassers used the same Written Consent to argue that Attorneys Becker and Vissepó had replaced Attorney Abesada. But Judge Méndez-Miró rejected the argument, holding that the Written Consent was invalid, and that Attorney Abesada was the proper legal representative of GFC and BGF. See, Docket No. 94-1. On this account, during the hearing, the court informed the parties that it agreed with Judge Méndez-Miró's Memorandum and Order. See, Docket No. 101, p. 1 (so

Add. 7

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 8

noting). And with this in mind, the court gave the parties two alternatives: either (A) agree to a stay pending adjudication of the RICO Action before Judge Méndez-Miró or (B) continue this case (Docket No. 101, pp. 1-2). Under Plan B, the court would receive briefing on Boyd and Lassers' standing to maintain the action, and adjudicate the issue (Id., p. 2). The parties chose Plan B. See, Docket Nos. 110-111. Then, they filed simultaneous briefs on standing (Docket Nos. 113 and 115). Plaintiffs responded (Docket No. 117); BPPR replied (Docket No. 127); and plaintiffs sur-replied (Docket No. 130).

### III.    DISCUSSION

With this narrative in place, it is now simpler to address the three pending issues: (1) whether GFC and BGF should be taken off this case; (2) whether Boyd and Lassers have standing; and (3) whether certain exhibits should be struck or restricted.

### A.  Should BGF and GFC Be Dismissed?

The court answered this question during the August 14, 2025, motion hearing. In particular, it expressed that it was persuaded by Judge Méndez-Miró's Memorandum and Order in the RICO Action, in that the written consent on which plaintiffs rely to support the position that Attorneys Becker and Vissepó are the proper legal representatives of BGF and GFC is invalid. See, Docket No. 101, p. 1. The reasoning underlying this conclusion follows.

#### 1.  The Arguments

The centerpiece of the dispute over who is the proper legal representative of GFC and BGF is the "Written Consent" (Docket No. 47-1), on which Boyd and Lassers rely to contend that the majority of GFC's members validly terminated Attorney Abesada as GFC's legal representative; retained Attorneys Becker and Vissepó as counsel; and had GFC and BGF join this case as co-plaintiffs. See, Docket No. 76, pp. 2-3. Attorney Abesada counters that the "Written Consent" is

Add. 8

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 9

invalid because it was not authorized by the Board of Managers of GFC (Docket No. 62, pp. 3-5).

And the Board of Managers, he posits, may only be overridden with the consent of a majority of

Series A Preferred Units—which Boyd and Lassers failed to obtain. Id. Boyd and Lassers

predictably disagree. They put forth two principal arguments. First, they argue that Section 3.2

of the GFC Operating Agreement allows a majority of members to override the Board of Managers

(Docket No. 76, p. 6). Second, they assert that the Board has forfeited its management rights by

violating its fiduciary duties and acting in bad faith (Id., pp. 5 & 7-9).

### 2. The GFC Operating Agreement

The governing document of a limited liability company like GFC and BGF is its "limited

liability company agreement," commonly referred to as the "operating agreement," defined as the

"written agreement (whether referred to as a limited liability company agreement, operating

agreement, or otherwise) adopted by the members . . . to govern the internal affairs and

administration of [the LLC]." P.R. Laws Ann. tit. 14, § 3951(g). That agreement sets forth the

rights and powers of members and managers of the company. See, P.R. Laws Ann. tit. 14, §§

3967; 3973 (so providing). Here, the operating agreement is the Second Amended and Restated

Operating Agreement, dated May 22, 2021, as amended. See, Docket No. 64-1.

From a bird's eye view, the Operating Agreement stipulates that GFC has two categories

of members. The first category includes the individual founding members (including Boyd and

Lassers), who hold common membership units. The second category are investors who, in

consideration for their investment, were provided with Series A preferred membership units.

These units give their holders a variety of rights and benefits such as voting, redemption, seniority,

distribution, and anti-dilution rights. See, Docket No. 64-1, pp. 30-34. Importantly, the Series A

preferred units are convertible to common units, and their holders have the right to vote with the

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 10

holders of common units on an as-converted-basis. Id., p. 31. All these members would, in accordance with a scheme that changed over time, be able to appoint managers to the Board of Managers.

The Written Consent on which plaintiffs rely is signed by four members who hold common membership units: Boyd (17.657%); Lassers (2.803%); John Lee Dumas (2.803%); and Olmar López-Vidal (32.231%). See, Docket No. 47-1, p. 4. Together, these members own 55.468% of all units (common and Series A preferred on a converted basis). However, no Series A preferred unit holder consented nor did the Board of Managers. And, as Judge Méndez-Miró held, the decisions on which attorney to appoint to represent the LLC and whether to join a litigation as a party are the clear and exclusive province of the Board of Managers. See, Docket No. 94-1, pp. 14-19.

The Operating Agreement, which reigns supreme in this context, states that the Board of Managers is vested with the "full, absolute and exclusive right, power and authority to manage the Company." See, Operating Agreement, Section 6.1(a) (Docket No. 64-1, p. 35). As well, the Board has "the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes herein, including exercising all powers, statutory or otherwise." Id., Section 6.2 (Docket No. 64-1, p. 37). In this light, the decisions that the Written Consent purports to take are vested on the Board of Managers, not on a majority of common unit members. This, however, begs the question of if (and when) the Board of Managers may be bypassed or overridden.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 11

### 3. Can the Board of Managers by Overridden or Bypassed Without Amending the Operating Agreement?

Attorney Abesada asserts that the only way to bypass or override the Board is to amend the Operating Agreement itself, a process that would require the vote of a majority of Series A preferred members (Docket No. 62, p. 3). But no Series A preferred member approved the Written Consent –let alone a majority thereof. On this, Attorney Abesada is correct. The Operating Agreement explicitly requires the approval of both the majority of the common units and the majority of the Series A preferred units. See, Docket No. 64-1, p. 53. Boyd and Lassers ratified this provision in the second amendment to the Operating Agreement. See, id., pp. 4 & 7. For their part, Boyd and Lassers do not dispute that they lack the votes to amend the Operating Agreement. See, Docket No. 76, p. 6. Instead, they claim that there is no need to amend the Operating Agreement to bypass or override the Board. As to why, they put forth two arguments.[9]

#### a. Section 3.2 of the Operating Agreement

First, Boyd and Lasssers direct the court's attention to Section 3.2 of the Operating Agreement, which states in part:

> Subject to any protective provisions in favor of the holders of the Series A Preferred Units, the Members may, subject to Section 4.2(j), act by written consent by the Majority Approval of the Members (a "Member Resolution").

Docket No. 64-1. p. 28 (Section 3.2 of Operating Agreement). Boyd and Lassers take this clause to mean that the members can bypass the Board of Managers. But as Judge Méndez-Miró pointed out, Section 3,2 merely "outlines particular circumstances in which the majority members may act

---

[9] Boyd and Lassers also write "Section 6.6 further provides that "[a]ny action required or permitted to be taken at any meeting of the Members may be taken without a meeting if a consent in writing, setting forth the action so taken, shall be signed by Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Members entitled to vote thereon were present and voted." SAC Ex. 87 at 38" (Docket No. 76, p. 6). However, Section 6.6 of Exhibit 87, does not contain such language and in fact merely pertains to the compensation of the Board of Managers and members. Consequently, it is of no use here.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 12

by Member Resolution." Docket No. 94-1, p. 18. It does not provide that the majority of Common

Unit Members may usurp or bypass the Board of Managers. So, this argument fails.

       b. The "Bad Faith and Violation of Fiduciary Duties" Argument

Second, Boyd and Lassers posit that the Board of Managers forfeited its own authority by

acting in bad faith and breaching its fiduciary duty of loyalty by engaging in "self-dealing and

conflicts" (Docket No. 76, p. 7). They point to Section 6.1(e) of the Operating Agreement, which

provides in part:

> [E]xcept as otherwise expressly required under this Agreement or the Act, all
> decisions to be made by or on behalf of the Company or in respect of the Company's
> business, capital, assets, funds and liabilities of the Company shall be made solely
> and exclusively by the Board of Managers; **provided that the Board of Managers
> agree to act in good faith** in taking such actions or making such decisions.

Docket No. 52-7, p. 21 (Section 6.1(e) of Operating Agreement)(emphasis added). Based on this

language, Boyd and Lassers argue that the Board of Managers forfeited its authority when it acted

in bad faith and violated its fiduciary duties by approving an Asset Acquisition Agreement in

January 2025 that handed payouts to its members, without unanimous member approval. See,

Docket No. 76, pp. 7-8. But no such cause of action was explicitly asserted in the SAC. Rather,

the Asset Acquisition Agreement brings forth a distinct issue, based on different factual allegations

unrelated to the present case, particularly because BPPR is not a party to the putative improper

asset sale, and the purchaser is not a party in this action.

Moreover, this matter arises under the Puerto Rico Law of Corporations – a state statute.

In this vein, Boyd and Lassers' argument is premised on this court having jurisdiction to adjudicate

what in effect is a state law controversy within a federal question case in which neither the

members of the Board of Managers nor the purchaser of BGF's assets are parties. The process

leads to an unsurmountable jurisdictional hurdle. To elaborate, Boyd and Lassers initiated this

Add. 12

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 13

action invoking federal question jurisdiction under 28 U.S.C. § 1331. See, Docket No. 57, p. 9, ¶ 1 (so stating). Still, Section 1367(a) provides that in civil actions where the federal courts have original jurisdiction: "the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action . . . that they form part of the same case or controversy under Article III of the United States Constitution."

Claims are part of the "same case or controversy" if they "derive from a common nucleus of operative fact" and are such that they would ordinarily be expected to be tried in one judicial proceeding. United Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966). For that reason, not every dispute "that arises between parties litigating a federal claim constitutes a part of the same Article III case" even when they are part of the same "ongoing and bitter dispute." Council of Unit Owners of the Wisp Condo, Inc. v. Recreational Indus., Inc., 793 F. Supp. 120, 122 (D. Md. 1992). That is what the court faces here.

This case revolves on an anti-tying claim under the Bank Holding Company Act, 12 U.S.C. § 1972. The only defendant is BPPR. The "nucleus of operative facts" necessary to adjudicate that claim has no overlap with the corporate boardroom dispute between Boyd and Lassers and the Board of Managers of GFC. Furthermore, a breach of fiduciary duty claim against the Board of Managers for the execution of the Asset Acquisition Agreement is "separately maintainable and determinable without any reference to the facts alleged or contentions stated in or with regard to" the anti-tying claim asserted in the instant case. O'Bannon v. Friedman's, Inc., 437 F.Supp.2d 490, 493 (D. Md. 2006)(quoting Hales v. Winn-Dixie Stores, Inc., 500 F.2d 836, 848 (4th Cir. 1974)). Federal courts "were not designated by the [Bank Holding Company Act] to be arbitrators of corporate boardroom disputes between shareholders." Lipham Constr. Co., Inc. v. Lipham, 2014

<u>Boyd; et al.</u> v. <u>Banco Popular de Puerto Rico, Inc.</u>
Civil No. 24-1569 (PAD)
Opinion and Order
Page 14

WL 11512410, *3 (N.D. Tex. July 22, 2014).[10]  Thus, the "bad faith-fiduciary duties" argument

fails.

### 4. Result

Based on the Operating Agreement of GFC, choosing, terminating, and hiring attorneys as

well as deciding whether to join a litigation are decisions reserved to the Board of Managers.  Boyd

and Lassers have not demonstrated how a Written Consent subscribed by a majority of Common

Unit Holders but without the consent of the Board of Managers or any Series A Preferred Unit

Holder can override or bypass the Board of Managers.  In consequence, the Written Consent on

which Attorneys Becker and Vissepó rely to justify their purported representation of GFC and

BGF is invalid.  Attorney Abesada remains as GFC's and BGF's appointed legal counsel.  Hence,

his notice of voluntary dismissal must be granted.  On that basis, only Boyd and Lassers remain as

plaintiffs.

### B. Do Boyd and Lassers Have Standing?

Now that GFC and BGF are no longer in the picture, the next issue is whether Boyd and

Lassers have standing.  If not, dismissal is appropriate.  This concern, raised in BPPR's first motion

to dismiss (Docket No. 20), was evidently the catalyst behind the SAC and plaintiffs' strategy to

bring in GFC and BGF as parties.  But with the new case configuration, Boyd and Lassers are back

to square one.  So, BPPR asserts that Boyd and Lassers lack standing because they failed to allege

that they suffered a direct injury.  According to BPPR, as alleged in the SAC, any injuries to Boyd

and Lassers derive from injuries to BGF.  In response, Boyd and Lassers claim that they did

properly allege direct injury pursuant to BHCA caselaw and that, alternatively, Boyd's capacity as

a guarantor provides him with the requisite standing.

---

[10] <u>Lipham</u> held this as to the Lanham Act but the analogy is equally applicable to the Bank Holding Company Act.

Add. 14

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 15

### 1. Legal Standard

A federal court "must satisfy itself as to its jurisdiction, including a plaintiff's Article III standing to sue, before addressing his particular claims, regardless of whether the litigants have raised the issue of standing." Pagán v. Calderón, 448 F.3d 16, 26 (1st Cir. 2006). Just as the plaintiff bears the burden of plausibly alleging a viable cause of action, "so too the plaintiff bears the burden of pleading facts necessary to demonstrate standing." Hochendoner v. Genzyme Corp., 823 F.3d 724, 730 (1st Cir. 2016).

Each element of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." Lujan v. Defs. of Wildlife, 504 U.S. 555, 561 (1992). Along this line, the First Circuit has directed courts to apply "the plausibility standard applicable under Rule 12(b)(6) to standing determinations at the pleading stage." Hochendoner, 823 F.3d at 730. Thus, the court takes the SAC's "well-pleaded facts as true and indulge all reasonable inferences in the pleader's favor." Id.

### 2. The Bank Holding Company Act's Anti-Tying Provision

The BHCA was enacted in 1956. Its original aim was to regulate "the power of bank holding companies to prevent a small number of powerful banks from dominating commerce and to ensure a separation of economic power between banking and commerce." Baggett v. First Nat. Bank of Gainesville, 117 F.3d 1342, 1345 (11th Cir. 1997) (citing S.Rep. No. 91–1084, 91st Cong., 2d Sess., reprinted in 1970 U.S.C.C.A.N. 5519, 5535 (1970); 116 Cong.Rec. 32127 (1970)). But in 1970, Congress amended the BHCA to "reach the anti-competitive practices of even smaller banks, which notwithstanding their comparative size, were able to exert economic power over businesses because of their control over credit." Id. In this manner, Congress added a section to

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 16

the BHCA prohibiting certain tying arrangements. The present incarnation of this provision is

found in 12 U.S.C. § 1972(1), which provides in part:

> A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement- . . . that **the customer** provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service.

12 U.S.C. § 1972(1)(C) (emphasis added).  Simultaneously, Congress enacted § 1975 of the

BHCA, creating a private right of action in favor of individuals harmed by virtue of violations of

§ 1972(1):

> **Any person** who is injured **in his business or property** by reason of **anything forbidden in section 1972** of this title may sue therefor in any district court of the United States in which the defendant resides or is found or has an agent, without regard to the amount in controversy, and shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including reasonable attorney's fees.

12 U.S.C. § 1975 (emphasis added).  This business-or-property formula tracks Section 4 of the

Clayton Act —the damages provision of the antitrust laws— and RICO.  Compare, 12 U.S.C. §

1975 with 15 U.S.C. § 15 (Clayton Act) and 18 U.S.C. § 1964(c) (RICO).  From this perspective,

courts have consistently held that "the rules established in anti-trust cases for identifying the proper

plaintiffs should be applied to RICO and the BHCA too." Mid-State Fertilizer Co. v. Exch. Nat.

Bank of Chicago, 877 F.2d 1333, 1335 (7th Cir. 1989)(collecting cases).[11]

---

[11] Incidentally, in Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992), the Supreme Court endorsed the application of anti-trust standing principles to RICO:

> We may fairly credit the 91st Congress, which enacted RICO, with knowing the interpretation federal courts had given the words earlier Congresses had used first in § 7 of the Sherman Act, and later in the Clayton Act's § 4.  It used the same words, and we can only assume it intended them to have the same meaning that courts had already given them.

Id. at 268 (internal citations omitted).  The same reasoning should logically apply to the BHCA.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 17

### 3. Standing Analysis

Reading the SAC as a whole and taking its well-pleaded factual allegations as true, it is apparent that Boyd and Lassers seek to recover damages derived from injuries inflicted on BGF and GFC.[12] That is, they contend that the acts and omissions of BPPR damaged BGF and GFC thus resulting in diminished unit values which, in turn, injured GFC's members including Boyd and Lassers.[13] As they claim in their "Memorandum on Standing:"

> All unit holders can demonstrate the concrete economic injury required for § 1975 standing: Diminished Unit Values[.] Tying arrangements that impair the LLC's business operations or impose additional costs directly reduce the value of membership interests.

Docket No. 115, p. 10. However, that presents a problem, for as the First Circuit has held, generally, "[a]ctions to enforce corporate rights or redress injuries to [a] corporation cannot be maintained by a stockholder in his own name . . . even though the injury to the corporation may incidentally result in the depreciation or destruction of the value of the stock." Pagán, 448 F.3d at 28 (quoting In re Dein Host, Inc., 835 F.2d 402, 405 (1st Cir. 1987). The same precept has been consistently applied in cases under the BHCA, RICO, and the Clayton Act. See, e.g., Mid-State Fertilizer Co., 877 F.2d at 1335 (collecting cases). At the same time, like all general rules, this one has exceptions, and they must be discarded prior to reaching a final decision.

---

[12] See, e.g., Docket No. 57, p. 8 (alleging that BPPR "destroyed the value of BGF and its parent company, GFC"); id., p. 40; ¶ 163 (BPPR allegedly caused "substantial financial damage to the company"); id., p. 44; ¶ 185 ("By tying the Third Credit Agreement and Offtake Agreements, BPPR ensured that, under the Lopezes' control, BGF was destined to run out of money"); id., p. 44; ¶ 187 (alleging that BPPR caused the "demise" of "BGF/GFC"); id., p. 53; ¶ 223 (alleging that BPPR "render[ed] BGF worthless"); id., p. 56; ¶ 242 ("BPPR injured [BGF] by destroying the value of BGF and GFC"); id., p. 59; ¶ 258 ("BPPR's tying practices caused BGF and GFC substantial damages").

[13] In fact, Boyd and Lassers assert that they "allege direct harm resulting from the destruction of value in their ownership Interests" (Docket No. 117, p. 16). But this is a non-sequitur. A corporation and its shareholders "are distinct juridical persons." Pagán, 448 F.3d at 28. If a company's value is destroyed then the injury the owners suffer is, by definition, derivative of the one suffered by the company. Labeling it "direct" does not make it so.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 18

For instance, a shareholder may be able to bring an action if he sustains an injury that "is peculiar to him alone, and [that] does not fall alike upon other stockholders." Pagán, 448 F.3d at 28. Even so, the SAC "does not allege that any of the individual shareholders sustained a particularized, nonderivative injury that might deflect application of the usual shareholder standing rule or that any other exception pertains." Id. at 29.[14] Still, Boyd and Lassers ditch Lassers' claim and grab ahold of Boyd's status as guarantor of the BPPR loan which, to their way of thinking, gives him the requisite standing. See, Docket No. 117, p. 16 (stating that Boyd "alleges direct injury in his capacity as guarantor, including his exposure to $19 million in liability from tied credit extensions executed without his consent"). In support, they cite to various cases. But the cases are unavailing.

Take Swerdloff v. Miami National Bank, 584 F.2d 54 (5th Cir. 1978). See, Docket Nos. 115, pp. 8-9; 117, p. 17. There, the Swerdloffs, a couple who owned 100% of a closely held corporation, personally guaranteed an Accounts Receivable Financing Arrangement. The defendant bank, however, conditioned the continuance of the arrangement on the couple selling 51% of their shares to another customer of the bank. On this fact pattern, the Fifth Circuit held that the Swerdloffs were "customers" of the bank and had standing to sue under § 1975 of the BHCA. That scenario is patently distinguishable. The alleged tying arrangement in this case was imposed on BGF – not on Boyd. The bank did not force Boyd to provide RLNG at a below market

---

[14] Boyd and Lassers also contend that Pagán recognizes another exception to the direct injury rule: where "it is absolutely inconceivable that the corporation itself would pursue a claim for the misconduct." (Docket No. 117, p. 16)(quoting Pagán, 448 F.3d at 28). This, however, is a mischaracterization by omission. The First Circuit in Pagán merely noted that "case law also **suggests** that there **may** be room for an exception if it is absolutely inconceivable that the corporation itself would pursue a claim for the misconduct." Id. But the only case that makes such a suggestion which Boyd and Lassers can cite to is Kavanaugh v. Ford Motor Co., 353 F.2d 710, 717 (7th Cir. 1965). In that case, it was held that a shareholder had standing to individually sue in a case in which the alleged malefactor owned all of the corporation's voting stock. See, id. Conversely, the alleged malefactor here is BPPR, which was never a shareholder of BGF or GFC.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 19

cost to BPPR in exchange for credit – it forced BGF. Moreover, as Judge Easterbrook noted in Mid-State Fertilizer Co., Swerdloff "does not make the derivative nature of the injury irrelevant." 877 F.2d at 1336. Rather, it simply "says that no unyielding rule confines recovery under the bank tying laws to the bank's customer." Id. That being so, Swerdloff "does not go to the other extreme and hold that anyone who has dealt with a bank as guarantor may recover for derivative injuries." Id. Therefore, it does not help Boyd.

The same conclusion follows with respect to Continental Illinois National Bank v. Stanley, 585 F.Supp. 1385 (N.D. Ill. 1984), which relied on Swerdloff to hold that "a stockholder and guarantor" had standing to sue under § 1975 of the BHCA. See, Docket Nos. 115, p .9; 116, pp. 17-18. Yet, Continental Illinois National Bank was explicitly disapproved by the Seventh Circuit in Mid-State Fertilizar Co., 877 F. 2d at 1336, thus depriving it of any material persuasive value.[15] As the Seventh Circuit explained:

> Guarantors are contingent creditors. If the firm stiffs a creditor, that creditor can collect from the guarantor; the guarantor succeeds to the original creditor's claim against the firm. We know that creditors cannot recover directly for injury inflicted on a firm, so guarantors as potential creditors likewise cannot recover.

Mid-State Fertilizer Co., 877 F.2d at 1336. Boyd attempts to distinguish Mid-State Fertilizer Co. arguing that he is not a contingent creditor inasmuch as he has been sued by BPPR, forcing him to incur legal fees and costs (Docket No. 117, pp. 16-17). Notwithstanding that the SAC also alleges that Boyd's personal guaranty is null (Docket No. 57, p. 9; ¶ 4), the fact is that the court cannot find —and Boyd does not point to— any allegation in the SAC to this effect. At bottom, those are not the damages Boyd is after in the SAC. The BHCA "does not say that any actual loan in

---

[15] The Seventh Circuit additionally noted in Mid-State Fertilizer Co. that the Fifth Circuit subsequently "trimmed Swedloff's "sails" in Campbell v. Wells Fargo Bank, N.A., 781 F.2d 440, 443 (5th Cir. 1986). In that case, the Fifth Circuit applied the Clayton Act's rule that, to have standing, a "plaintiff must demonstrate that his injury was a direct consequence of the alleged antitrust violation," to BHCA anti-tying claims. See, 781 F.2d 443.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 20

violation of its terms is unenforceable." Exch. Nat. Bank of Chicago v. Daniels, 768 F.2d 140, 144 (7th Cir. 1985). And although § 1975 permits a treble damages action by an injured party, an "obligation to pay back a loan actually made is not an injury." Id.

Further, Boyd looks for support in Costner v. Blount National Bank, 578 F.2d 1192 (6th Cir. 1978), a case which he characterizes as recognizing "liability and damages for a guarantor/dealership owner who suffered direct personal losses from forced unfavorable terms under a BHCA tying violation" (Docket No. 117, p. 18). In Costner, the defendant bank conditioned giving the plaintiff, a 50% owner of a car dealership, a $420,000 personal loan to buy the other 50% of the dealership's stock, to the sale of substantially all installment paper from car sales to the bank; the hiring of an employee designated by the bank to ensure compliance; and the pledging of all stock as collateral.

Eventually, the dealership experienced difficulties; the bank threatened with foreclosure; and the plaintiff was forced to assign his stock to the bank, which then proceeded to sell the business at significantly below market value to the brother of the bank vice-president in charge of the loan. The case went to trial and the jury found the bank liable, awarding $60,000 to the plaintiff. The issue of standing was put in the hands of the jury, which was instructed in part that:

> If plaintiff is to recover he must prove that as a result of the tying arrangement the sale of his stock in the corporation was for less than its fair market value at the time. **The injury to the stockholder must be direct and not merely consequential or derivative through the corporation. Depreciation in the value of the stock that occurred before the sale of the stock because of injuries directly affecting the corporation rather than the shareholder cannot be recovered**. The sale of the stock must result in further loss to the shareholder and not merely substitute the already depreciated value of the stock for money of equal value.

Id., 1195 (emphasis added). Thus, unlike in this case, in Costner there was a direct injury at play –the plaintiff's stock was sold at below market value. In other words, the depreciation of the stock

Add. 20

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 21

due to the tying arrangement was immaterial –what mattered was that the plaintiff was forced to sell the stock below its fair market value at the time, however low it was. So, this case does not help Boyd.

Boyd also cites Johnstone v. First Bank System, Inc., 947 F.Supp. 1220 (N.D. Ill. 1996), asserting that it involved "trust beneficiaries" who are "analogous to unit holders" (Docket No. 115, p. 9). Yet, Johnstone involved a derivative complaint where plaintiffs brought claims on behalf of two trusts. See, Johnstone, 947 F. Supp. at 1222 (noting that claims were asserted on behalf of the trusts and that it involved a motion to dismiss the "First Amended Verified Derivative Complaint"). That is a bridge too far, for it was only in response to BPPR's memorandum on standing, that Boyd and Lassers asserted for the first time that they had adequately pleaded standing to sue derivatively on behalf of BGF (Docket No. 117, p. 119). In addition to being untimely beyond hope, the argument is oblivious to the requirements set in Federal Rule of Civil Procedure 23.1 to state a derivative claim. And the SAC does not meet those requirements.

To begin with the obvious, Rule 23.1 states that "[t]he Complaint must be verified." The SAC, however, is not verified. Shifting to the more granular, Rule 23.1 requires that the complaint "state with particularity any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). But the SAC does not plead –let alone plead with particularity– any such elements.[16] In consequence, plaintiffs' argument fails.

---

[16] Plaintiffs cite to paragraphs 255-257 of the SAC as proof that they adequately pleaded demand futility (Docket No. 117, p. 19). But those three paragraphs clearly do not support that proposition. Paragraph 255 merely incorporates all the prior allegations of the SAC; paragraph 256 then alleges that BPPR "breached the fiduciary duties" it supposedly owed plaintiffs; and paragraph 257 alleges that the purported tying transaction "saddled BGF with an additional $1 million in debt." See, Docket No. 57, pp. 58-60; ¶¶ 255-257.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 22

To summarize, at the end of the day, the SAC does not allege any direct injury to Boyd or Lassers; and fails to adequately plead a derivative action. In that regard, Boyd and Lassers lack standing to assert anti-tying claims under the BHCA. Correspondingly, their claims must be dismissed.

### 4. The Court Declines to Exercise Supplemental Jurisdiction Over the State Claim

As a final coda, the court must briefly address the thus far ignored state claim asserted in the SAC. See, footnote 1, supra. In the absence of any remaining federal claims, it is within the Court's discretion to retain supplemental jurisdiction over remaining state claims. See Carlsbad Tech., Inc. v. HIF Bio, Inc., 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise that jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). Where, as here, the federal claims are dismissed "at an early stage of the proceedings," a District Court is "well within its discretion to decline to exercise supplemental jurisdiction over pending state-law claims." Bonilla-Gonzalez v. Elevance Health Companies of Puerto Rico, LLC, 2024 WL 4769767, *2 (D.P.R. Nov. 13, 2024)(collecting cases). Hence, in the interest of judicial economy, convenience, fairness, and comity, the court declines to exercise supplemental jurisdiction over the state claim.

### C. The Dispute Over Exhibits

In his "Motion to Strike," Attorney Abesada seeks, inter alia, to strike some of the SAC's exhibits because they potentially expose BGF and GFC to "sanctions, costs, and attorney's fees in this action and third-party litigation" (Docket No. 62 p. 5). During the August 14, 2025, motion hearing, the court expressed that the Motion to Strike at Docket No. 62 would be denied without prejudice as to the exhibits, but that Attorney Abesada could refile a Motion to Strike specifying which exhibits he moves to strike and why" (Docket No. 101, p. 2, n.1). The court also encouraged

Add. 22

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 23

the parties to attempt to reach an agreement as to the exhibits at issue. Id. In compliance, Attorney

Abesada filed a "Motion to Restrict Certain Exhibits in the Second Amended Complaint" (Docket

No. 119). There, he replaced his request to strike with one to simply restrict certain exhibits to

case participants only. Plaintiffs never responded to or opposed this motion. So, it is unopposed.

Nevertheless, a careful review makes it clear that the motion should be granted. With this in mind,

the Clerk is hereby ordered to restrict Exhibits 67, 68, 69, 73, and 85 (Docket Nos. 51-7; 51-8; 51-

9; 51-13; 52-5) of the SAC to "case participants only."

## IV.    CONCLUSION

For the reasons stated, BGF and GFC's "Notice of Voluntary Dismissal" (Docket No. 63)

is GRANTED; the "Motion to Withdraw the Notice of Voluntary Dismissal" (Docket No. 77) is

DENIED; the parties' "Motions in Compliance" (Docket Nos. 110-111) and "Memorandums on

Standing" (Docket Nos. 113, 115) are NOTED; the "Motion to Strike (Docket No. 62) is

GRANTED IN PART as to the contention of the Written Consent's nullity and DENIED

WITHOUT PREJUDICE IN PART as to the request to strike certain exhibits; and the "Motion to

Restrict Certain Exhibits in the Second Amended Complaint" (Docket No. 119) is GRANTED.[17]

In these circumstances, the case is dismissed. To this end, GFC and BGF are voluntarily dismissed

as parties here; and given that Boyd and Lassers lack standing to individually assert claims under

the BHCA, their claims are dismissed. The court declines to exercise supplemental jurisdiction

over the remaining state claim.

Judgment shall be entered accordingly.

**SO ORDERED.**

---

[17] As a last housekeeping matter, plaintiffs' "Motion Submitting Certified Translation (Docket No. 125) is noted and their "Motion to Amend/Correct Exhibits 6, 24, 32, and 61" (Docket No. 59) is granted *nunc pro tunc*.

Boyd; et al. v. Banco Popular de Puerto Rico, Inc.
Civil No. 24-1569 (PAD)
Opinion and Order
Page 24

In San Juan, Puerto Rico, this 22nd day of December, 2025.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge

Add. 24

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| GREGORY BOYD; ET AL., <br><br> Plaintiff, <br><br> v. <br><br> BANCO POPULAR DE PUERTO RICO, <br><br> Defendant. | CIVIL NO. 24-1569 (PAD) |

**JUDGMENT**

In accordance with the Opinion and Order issued today (Docket No. 131), judgment is hereby entered dismissing this case.

This case is now closed for statistical purposes.

**SO ORDERED.**

In San Juan, Puerto Rico, this 22nd day of December, 2025.

s/Pedro A. Delgado-Hernández
PEDRO A. DELGADO-HERNÁNDEZ
United States District Judge

Add. 25

| 03/10/2026 | 140 | ORDER: Denying 134 "Motion for Reconsideration." The court has carefully considered plaintiff's arguments and supporting authority as well as defendant's response thereto and finds no reason to deviate from its previous ruling. As to the request for leave to file a Third Amended Complaint, it is both futile and untimely. The First Circuit has held that "when a considerable period of time has passed between the filing of the complaint and the motion to amend, courts have placed the burden upon the movant to show some valid reason for his neglect and delay." See, Nikitine v. Wilmington Tr. Co., 715 F.3d 388, 390-391 (1st Cir. 2013). Plaintiffs did not meet this burden. Signed by Judge Pedro A. Delgado-Hernandez on 03/10/2026. (HOD) (Entered: 03/10/2026) |

**12 U.S.C. § 1972(1)**

A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement-

(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service;

(B) that the customer shall obtain some additional credit, property, or service from a bank holding company of such bank, or from any other subsidiary of such bank holding company;

(C) that the customer provide some additional credit, property, or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit, or trust service;

(D) that the customer provide some additional credit, property, or service to a bank holding company of such bank, or to any other subsidiary of such bank holding company; or

(E) that the customer shall not obtain some other credit, property, or service from a competitor of such bank, a bank holding company of such bank, or any subsidiary of such bank holding company, other than a condition or requirement that such bank shall reasonably impose in a credit transaction to assure the soundness of the credit.

The Board may issue such regulations as are necessary to carry out this section, and, in consultation with the Comptroller of the Currency and the Federal Deposit Insurance Company, may by regulation or order permit such exceptions to the foregoing prohibition and the prohibitions of section 1843(f)(9) and 1843(h)(2) of this title as it considers will not be contrary to the purposes of this chapter.

Add. 27

**12 U.S.C. § 1975**

Any person who is injured in his business or property by reason of anything forbidden in section 1972 of this title may sue therefor in any district court of the United States in which the defendant resides or is found or has an agent, without regard to the amount in controversy, and shall be entitled to recover three times the amount of the damages sustained by him, and the cost of suit, including a reasonable attorney's fee.